UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
NURSE ANONYMOUS,

      Plaintiff,

    -v-

GOOD SAMARITAN HOSPITAL
OF SUFFERN, NY, BON SECOURS
CHARITY HEALTH SYSTEM,
& WESTCHESTER MEDICAL
HEALTH FOUNDATION, INC.,

      Defendants.
------------------------------------------------------------X

COMPLAINT

20 CIV.       (    )

JURY TRIAL DEMANDED

SUMMARY

1. Plaintiff brings this action to recover damages for the Defendants' failure to provide her accommodations under the Rehabilitation Act and related laws. Defendant did not provide Plaintiff a proper personal protection (PPE) mask, even though she was working in the ICU with a patient who was obviously COVID positive. The doctor, for reasons incomprehensible, refused to test the patient despite apparent symptoms.

2. Again and again, Plaintiff asked (1) for proper PPE; and (2) whether the doctor who insisted the patient was not suffering from COVID had been misdiagnosed. But the doctor had committed gross negligence. A few days after Plaintiff's caring for this person – who exhibited classic symptoms of COVID-19 – the patient died of the disease.

3. The family requested that the hospital test the deceased patient's body for COVID-19; the body, unsurprisingly, tested positive. Defendant Good Samaritan[1] notified Plaintiff of this. She then sought out testing. When ready to return beyond the stage of contagion (or symptoms),

---

[1] Unless otherwise indicated, "Defendant," without a particular designation of Westchester Health or Bon Secours, shall refer to Good Samaritan, as this was plaintiff's place of employment.

however, Defendant refused to get them the proper PPE and would not accommodate another assignment.

## THE PARTIES

4. Plaintiff is a resident of the State of New York and seeks to precede anonymously because:

   a) the litigation involves matters that are highly sensitive and of a personal nature;

   b) identification poses a risk of retaliatory harm to the Plaintiff, even possibly innocent non-parties in her situation;

   c) identification presents other damages and increases their severity, including the injury and claims litigated. Plaintiff fears not only that her identification as having been exposed COVID-19, even after emerging from quarantine, could well make her less employable. It might result in potential retaliatory act by a prospective employer.

   d) plaintiff is particularly vulnerable to possible harms of disclosure, particularly in light of her young age;

   e) the Defendants will suffer no prejudice by allowing the Plaintiff to press her claims anonymously, and if they believes otherwise, it may ask the district court to mitigate any harm;

   f) plaintiff's identity has thus far been kept confidential;

   g) the public's interest in the litigation advances public knowledge by allowing the Plaintiff to remain confidential, as this is a case of importance in this pandemic.

5. Good Samaritan Hospital of Suffern, N.Y., is a nonprofit corporation organized under the laws of New York with offices in Suffern, New York. It is part of the Westchester Medical Health Center Network (WMC) and the Bon Secours Charity Health System Affiliated Group, a for-profit

Health Corporation whose principal place of business is at Good Samaritan in Suffern. WMC owns a 60% share of Good Samaritan, the other 40%, upon information and belief, is owned by Bon Secours.

6.      Bon Secours' Mission "is to make visible God's love and to be good help to those in need, especially those who are poor, vulnerable and dying. As a system of caregivers, we commit ourselves to help bring people and communities to health and wholeness as part of the healing ministry of Jesus Christ and the Catholic Church."

7.      Bon Secours revenues are only slightly higher than its expenses, but it has an endowment exceeding $51,000,000, according to its IRS Form 990, and $6,459,000 of off-shore investments. Good Samaritan, as a part of Bon Secours, files no tax returns.

8.      Westchester Medical Health Foundation, Inc. (WMH) does business as the "Westchester County Health Care Corporation." The former corporation has registered with New York and has offices in Valhalla, New York. The latter perhaps calls itself a "corporation" in the general sense. It has an endowment of $24,358,374, according to its latest 990. All of these numbers will mean something when we see what defendants were unwilling to do to accommodate Plaintiff.

9.      All defendants receive federal financial assistance, including but not limited to Medicaid and Medicare.

JURISDICTION AND VENUE

10.     Jurisdiction is proper in this district under 28 USC. § 1331 in that this action arises under the Constitution and laws of the United States, among them the Rehabilitation Act. State claims are pendant under the same common nucleus of operative fact.

11.     Venue is proper in this district under 28 USC. § 1391(c)(2) in that Defendants reside in this judicial district.

FACTUAL ALLEGATIONS

12. Plaintiff repeats and realleges the allegations outlined in paragraphs 1 through 11 as if fully set forth herein.

13. Plaintiff is a relatively recent college graduate with a Bachelor's in Nursing. She started employment as a nurse at Samaritan and worked there in the surgical intensive-care unit in October 2018. Her Nursing Manager was Megan Hayes. Ranking above Hayes was Chief Nursing Officer Phyllis Yezzo.

14. While Plaintiff was working from her start date until she suffered a constructive discharge, she had no problems at Samaritan. She even received some compliment cards from five or six patients.

15. She had at least one early evaluation. The last one was in January 2020, and it was uniformly positive.

16. Early in March, Plaintiff heard on television that someone famous had died. That was her first information about COVID. No one at the hospital spoke of the possible pandemic, even though there was sufficient information (for the hospital alone) to make preparations. As March progressed, there were, upon information and belief, ten cases at Samaritan.

17. When COVID patients arrived, Samaritan did the medically proper thing and put suspected patients in negative-pressure rooms where the controlled atmosphere to avoid the spread of disease. The staff intubated some patients, and nurses wore the proper N95 masks, medically appropriate under OSHA guidelines.

18. But Plaintiff's only training was a PowerPoint presentation about the respirator, and the PowerPoint imparted not much information.

19. Per Samaritan procedures, Plaintiff underwent a "fit test." This test is an intricate event wherein testers place various sizes of masks on the nurse's face, who then smells and tastes to be

sure nothing airborne seeps through into the mouth and lungs, and to ensure a seal to avoid the spread of viruses or bacteria.

20. Plaintiff tested twice and could still smell and taste, so the typical N95 did not work.

21. As such, she needed a special mask known as a PAPR – an atypical type of headcover, which stands for "powered, air-purifying respirator."

22. The PAPR costs about $1,700 and is available on Amazon.com. Cartridges are required, and they last about five years, costing about $125.

23. Defendants did not give Plaintiff a PAPR. Instead, the hospital tester estimated her face for the much cheaper N95, which she nevertheless never got. However, Samaritan registered her on a card, saying that she *would* fit for a PAPR. The Hospital holds onto the certificate, to show compliance with OSHA guidelines, but the card means nothing: Samaritan never gave Plaintiff the protection for which she tested.

24. Samaritan and Secours pay lip service to its mission "to make visible God's love and to be good help to those in need." The Westchester Network has no mission except to raise money for the other hospitals, but it, too, pays only lip service a commitment to PPE. The CEO, Michael D. Israel recently pat his network on the back on the Samaritan website:

> WMCHealth has adequate PPE, ventilators, medical equipment[.] . . .WMCHealth has proper PPE on hand. . . . Our care teams have been extremely conscious about the appropriate use and conservation of PPE, and are working under current CDC guidelines for PPE use.

*See* https://www.goodsamhosp.org/news/message-from-president-and-ceo-michael-d-israel-1414  (last visited April 17, 2020).

25. But the truth is that Samaritan didn't have any PAPR's – though Plaintiff was also told they were "broken" or "needed cartridges." Jesus might not have delivered these cartridges, but

Amazon would have. The Good Samaritan (and its funders) didn't want to buy one, despite its colossal endowment, to protect a young nurse who was put at risk as a result of one of its own doctor's gross negligence by refusing to test the patient who almost certainly had COVID.

26. The patient was the only one that Plaintiff sat with all night on the patient's last night and had classic symptoms of COVID.

27. The patient had pneumonia and had earlier been placed into a negative pressure room and put on precautions for COVID-19.

28. The doctor told Plaintiff that if one has pneumonia, it would have to be on both sides of the lungs if there were to be a COVID test. This diagnosis was pure pretext. Notwithstanding the lung criterion, the patient had also had a fever of 103, was diaphoretic (profusely sweating). She was brain stat – and "stat" means NOW. In other words, the patient had little brain activity.

29. The patient's oxygen saturation was in the mid-80's on a non-breather mask. One's blood oxygen level is a measure of how much oxygen one's red blood cells are carrying. Getting a ratio of oxygen within the 80's is not a "B": it is an "F." A healthy percentage is 95-100%.

30. The patient was on supplemental oxygen. Plaintiff put a mask on her face, and was still not getting enough oxygen. It seemed clear to the young nurse.

31. Plaintiff spoke to the day nurse and her night supervisor. She told them that the patient did not have any protections, and she could not get a mask or for Plaintiff's protection.

32. One of these nurses said, as late as the end of March 2020, "I've lived through three of these end-of-the-world pandemics, and we'll be ok."

33. She texted her direct manager, Megan Hanys, and told her that she lives with senior parents who are hypertensive, diabetic, and obese: risk factors that can make this virus deadly should they contract it.

34. Plaintiff also told Hanys that she had had Chronic Kidney Disease since she had been an infant, and reminded her that the reports from China show the virus can shut the kidneys down.

35. But Hanys did not fulfill Bon Secours' mission as Christ's mission, or even, in a mostly secular and objective way, see the obvious. Instead, she told Plaintiff to calm down.

36. Plaintiff then went above her and told the charge nurse. That nurse, in turn, looked at the patient's chart and remained silent. The charge nurse did not refute Plaintiff, though likely there was nothing she could do.

37. Plaintiff, many times, started looking for supplies to protect him. She found one surgical mask, though as part of her duties, she had to suction virus-laden gunk out of the patient's throat.

38. One other nurse also assigned to the patient was sure COVID was at play.

39. By this time, all the N95 masks were being kept with the supervisors or designated only for suspected COVID-19 patients. Plaintiff spoke to Marie Van DeVere, the supervisor that night, and said how uncomfortable she was to be taking care of this patient, her air passages fully exposed. Plaintiff noted she did not understand the rationale for not testing this patient for COVID-19. At least a positive test would have allowed some protection for Plaintiff.

40. Upon returning to work in two or three days, she learned the patient had died of COVID.

41. Plaintiff went home, was swab tested as soon as possible, started suffering COVID symptoms. After waiting five days for the result, she learned she tested positive.

42. She followed CDC guidelines – i.e., as to when to go in and out of isolation. Then she called the hospital in a week.

43. The CDC rules require to discontinue isolation only after (1) seven days from the onset of symptoms; (2) and on the eighth to be without fever for three days without the use of Tylenol and have a general improvement of symptoms.

44. She called her primary care doctor, especially given that she has kidney disease.

45. She was in isolation from approximately March 16-30, 2020.

46. Still, she felt terrible after seven days and stayed out of work until April 7 (approximately).

47. Then, she felt good enough to go into work.

48. She reported to the command center, which Samaritan converted into a fit testing station. She said that it is "my first night back, and I have been infected." Both masks available did not work because she tasted the solution. Still, she could not get the PAPR.

49. She worked two nights in an N95 cover. The first night, the mask would just come off her face. There was no one left to whom she could complain.

50. The next day she went to the command center, and, still, there were no new masks.

51. Her supervisor, nurse Adrienne, said, "Didn't you get fit tested yesterday."

52. Plaintiff replied, "Yes, but the mask was too small."

53. Adrianne contradicted him as if to refute reality. Adrianne said, "You passed yesterday. What games are you playing?"

54. The suggestion of "game-playing" was purely to insult and demean Plaintiff, who contradicted her and said, "No, [the fit tester] just took the best one available. I've been infected already, and I just want something to work for me!"

55. It wasn't much to ask.

56. Adrien replied, "What you want us to do about it?"

57. Plaintiff said, "All I want is a mask that fits."

58. Adrien had no answer.

59. An occupational health nurse said, "She needs the PAPR."

60. Adrien said, "We don't have any. We need to find something else that will work."

61. But Plaintiff had been gone for three weeks, and the hospital did nothing during that time. Indeed, while isolated, Plaintiff spoke to her regular manager about the PAPR, and the manager said, "Just get fit tested again." Plaintiff's response was irrefutable: "How can I be accurately fit-tested since the test is based on smell and taste?" At the time plaintiff had neither (nor very little).

62. Amazon delivers quickly, and Plaintiff could have gone home or done something else in the meantime, while Bon Secours fulfilled its mission to the needy – in this case, Plaintiff.

63. The occupational nurse who stood by and advocated for Plaintiff said, "Can't she [plaintiff] go to a clean unit?"

64. There was a unit opened for non-COVID patients in a building formerly used for chronic dialysis patients.

65. Adrien's response: "She's a critical care nurse." In other words, because the Good Samaritan hired her as a critical care nurse – and despite that Samaritan put her in more harms' way than other patients – she would not receive accommodation with a less dangerous job.

66. But she could have been. ICU is a challenging assignment, but it takes extra training to work there. There were other jobs of lesser risk to Plaintiff for which she was qualified, given her nursing education and training.

67. So it was a Hobson's choice for Plaintiff: risk reinfection or quit. That was where Samaritan was angling him. She called her parents about this untenable situation, and they agreed she should resign.

68. She sent a resignation letter that Wednesday morning. She gave two weeks-notice and emailed again to follow up

69. But she made clear she would not work in ICU/critical care unless she got a PAPR.

70. She added, "Let me know if we can resolve this."

71. Adrien's response: "I'm sorry you're leaving, but I understand."

72. Plaintiff's occupational health nurses (at Samaritan) said she couldn't be taking care of critical patients without a surgical mask.

73. As far as working in one of the "clean units," this would not have been contraindicated. As the Stanford Medical School reports that after a 14-day quarantine (and Plaintiff's was longer), "Someone who has been released from quarantine is not considered a risk for spreading, according to the CDC. *See* https://stanfordhealthcare.org/stanford-health-care-now/2020/novel-coronavirus/faqs-about-covid-19.html (last visited April 17, 2020).

74. Indeed, according to CEO Israel, in the post cited above, Samaritan is following CDC guidelines. However, the hospital is not following OSHA's new COVID guidelines, and many nurses were filing OSHA complaints, though not Plaintiff.

75. The facility continuously required staff to reuse N95 masks for a workweek or a total of 36 hours, regardless of manufacturers' recommendations or after concerns raised by staff. Samaritan instructed them to place contaminated covers in a lunch bag, then bring the bags home. Then they would be brought home, maybe cleaned and brought back to the next shift, later reused.

76. The hospital gave staff one plastic gown per shift and instructed to "wipe it down" between patients with antimicrobial wipes, then hang it up to air dry.

77. These are one-piece gowns that are donned and doffed by bringing the neck over the nurse's head, past her face. This action, done multiple times a day, putting the wearer further at risk of contamination.

78. Staff raised concerns and but were shamed by management that it is safe because of the wipe down. But in wiping down, the antimicrobial wipes, which are not for use on skin, but would unavoidably touch the nurses' skin. Many reported irritation due to fumes and stinging.

79. As of 4/14/20, there were 65 staff members out sick due to a lack of appropriate PPE.

80. As long as she wore a proper mask, Plaintiff should have been safe to herself and others. Her mouth and nose would be covered, and she wasn't coughing or sneezing at the time. Her hands would be clean. She spent time enough in quarantine. She was not contagious.

81. The hospital not only refused accommodation but discriminated against him directly by refusing to reassign him *and* refuse to pay a measly $1,800 to protect a young, dedicated, good nurse's life.

82. Without the PAPR, she could not work. The ICU was more dangerous for him because she knew to avoid any immunocompromised patients, which populate the critical care portions of the hospital.

83. After she quit, she got a call from Phyllis M. Yezzo, DNP, RN, CPHQ, NEA-BC

84. SVP, Patient Care Services, and Chief Nursing Officer. She is also a professor of nursing at New Rochelle College.

85. She asked him to return, although in what capacity she did not say, though Yezzo said the PAPR's at the hospital needed the $125 cartridges mentioned above, so she seemed to be steering him.

86. But her reference to the PAPR cartridges was just a lie. The hospital had none. The story kept changing, and the Good Samaritan could have ordered one! Plaintiff, wanting to be polite, ended the call saying she'd think about it.

87. The next day, she responded by email:

> I have thought about our phone call thoroughly over the past day. The whole reason I decided to leave Good Samaritan Hospital was because I felt unprotected from COVID-19. I was already infected once while working there, only to return to work to be told I would not have a PAPR device, or a properly fitting mask available for my use. While on the phone, you stated that only droplet precautions are required while helping patients infected with the virus.

11

> As an ICU nurse in this pandemic, I am exclusively working with patients that are on ventilators and need to be suctioned, creating aerosol particles as outlined on the CDC website. *You also stated that your glasses were fogging with the N-95 mask on. I was confused as to why you [we]re wearing a respirator if you believe[d] staff entering COVID patients' rooms only require droplet precautions.* [This was a reference to a phone conversation in which Yezzo tried to convince Plaintiff that the N95 was not worth the bother.] I feel that in the 3 weeks I was isolated at home with COVID-19, the hospital could have invested in a PAPR device for my protection, or at least replaced the "cartridges" on the broken ones, as you said. A reasonable accommodation would be to place me in a NON-COVID unit. Adrianne already made it clear that, because I am a critical care nurse, this will certainly not happen. This all being said, I will not be returning to Good Samaritan Hospital unless a PAPR device is made available or I would be exclusively placed on a 'clean' unit. If not, I will be applying for COVID enhanced unemployment benefits and start looking for new employment elsewhere. I feel that I have been more than fair under the circumstances, even after the Director of Nursing insulted my integrity and disregarded my safety. I will wait until 5 P.M. Wednesday, April 15th, for your answer. Thank you for your time.

(Italics supplied.)

88. The young nurse with integrity told it like it was – and called her out on her contradiction that nurses didn't need N95's – a lie! – yet she used one for herself.

89. Her response, purely a lie: "Thank you for getting back to me. I was hoping you would reconsider returning to GSH. I am disappointed you have not reconsidered. Please know we are open to exploring your return in the future should you change your mind."

90. Change her mind about her life? Nurse Yezzo, indeed, should be "disappointed" – in herself. She discriminated against Plaintiff – a violation of her oath as a nurse. Even if she were acting as a mouthpiece to be sure that Plaintiff quit and the hospital did not fire him, she failed in Bon Secours' stated mission to God and the sick. She should be ashamed.

91. While Defendant indubitably tried to finagle the happening such that it would not fire Plaintiff, a constructive termination this surely was. Plaintiff – to use Nurse Yezzo's self-righteous words – was "disappointed" thatDefendantt had "not reconsidered."

92. Defendants lost an excellent young nurse, who rightly sues for redress.

## COUNT ONE
## FAILURE TO ACCOMMODATE
## REHABILITATION ACT

93. Plaintiff repeats realleges and incorporates by reference every allegation previously made above.

94. Defendant receives many forms of federal financial assistance and is an "employer" under the Rehabilitation Act.

95. Plaintiff is a covered employee under the Rehabilitation Act because (a) she had a record of a disability. She recovered from COVID-19, a condition that can kill, but that substantially limits one or more major life activities, such as breathing, taste, and smell; (b) defendant perceived him to have a continued disability despite having emerged from quarantine under CDC guidelines.

96. Plaintiff also told her supervisor that she had a chronic kidney condition that substantially limits her ability to eat certain foods and, more importantly, filter nutrients from the bloodstream and to eliminate waste.

97. Defendant refused to accommodate Plaintiff by

   (a) Refusing to give him a proper respirator;

   (b) Refusing to change her assignment to one of the other units, where jobs were available.

98. As a result, Plaintiff has and will continue to suffer monetary damages, severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses determined at trial.

## COUNT TWO
## REHABILITATION ACT
## ANIMUS BASED ON ACTUAL OR PERCEIVED DISABILITY

99. Plaintiff repeats realleges and incorporates by reference every allegation previously made

above.

100. Defendant perceived Plaintiff as contagious in refusing to assign him to one of the "clean" units and as a higher risk to the hospital given her kidney disease.

101. If the Defendant wanted Plaintiff to return, it would have found a PAPR or assigned him to a "clean" unit

102. It failed to do so purely out of stigma and fear, grounded in discrimination based on disability.

103. As a result of the preceding, Plaintiff has been damaged.

## COUNT FOUR
### DISABILITY DISCRIMINATION UNDER THE STATE HUMAN RIGHTS LAW
### FAILURE TO ACCOMMODATE

104. Plaintiff repeats and realleges all previous paragraphs as if set forth herein.

105. As a result of the preceding, Plaintiff has been damaged.

## COUNT FIVE
### RETALIATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW
### ANIMUS BASED ON ACTUAL OR PERCEIVED DISABILITY

106. Plaintiff repeats and realleges all previous paragraphs as if set forth herein.

107. As a result of the preceding, Plaintiff has been damaged.

## COUNT SIX
### VIOLATION OF NEW YORK LABOR LAW § 741

108. Plaintiff repeats and realleges all previous paragraphs.

109. Defendant took retaliatory action against Plaintiff because she (a) disclosed to a supervisor a policy or practice of the employer that Plaintiff, in good faith, believed constituted improper quality of patient care; and (b) objected or refused to participate in such activity.

110. Plaintiff brought the inadequate quality of patient care to the attention of a supervisor and afforded the employer a reasonable opportunity to correct such activity, policy, or practice.

111. As a result of the preceding, Plaintiff was constructively discharged.

112. Plaintiff has been damaged and is entitled to reasonable attorneys' fees.

## COUNT SEVEN
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

113. Plaintiff repeats and realleges all previous paragraphs as if set forth herein.

114. Defendant Samaritan and Bon Secours' conduct was 'so outrageous in character, and so extreme, as to go beyond all possible bounds of decency. It was utterly intolerable in a civilized community.

115. Defendants sent Plaintiff into a whirlwind of panic and fear. Being in her early twenties, with Chronic Kidney Disease, living with elderly parents with multiple chronic conditions, she feared the absolute worst for everyone.

116. She has yet to be diagnosed but is seeking medical care.

117. She was emotionally stable before this, so the causation is plain.

118. The intentional actions of the hospital include but are not limited to:

   (a) failing to recognize the apparent COVID symptoms of the patient who died;

   (b) failing to procure a PAPR;

   (c) lying to Plaintiff about its inability to obtain one (or that those in the hospital needed cartridges or were broken);

   (c) accusing her of "playing games" when she simply asked for proper PPE.

119. As a result of the preceding, Plaintiff has been damaged.

WHEREFORE, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I. Compensatory damages in an amount no less than $1,000,000 to Plaintiff whole for any earnings, including bonus payments, she would have received but for Defendants' discriminatory treatment and constructive termination, including but not limited to, back pay, front pay and pension benefits;

II. Compensatory damages bestowing upon plaintiff money damages for mental anguish, loss of dignity, humiliation, and injury to livelihood in an amount that is fair, just, and reasonable, to be determined at trial.

III. Attorneys' fees under the Rehabilitation Act and such other statutes that allow it;

IV. Punitive damages to be determined by the trier of fact;

V. Prejudgment interest and costs; and

VI. Such other and further relief that the Court may deem just and proper.

Dated: New York, New York
April 18, 2020

*Greg S. Antollino*
GREGORY ANTOLLINO, ESQ.
275 SEVENTH AVENUE, SUITE 705
NEW YORK, NEW YORK 10001
(212) 334-7397

gregory@antollino.com