# GREGORY ANTOLLINO
### ATTORNEY AT LAW

GREGORY10011@ICLOUD.COM
WWW.ANTOLLINO.COM

275 SEVENTH AVENUE, SUITE 705
NEW YORK, NEW YORK 10001

TEL. (212) 334-7397
FAX (212) 334-7399

May 19, 2020

Judge Nelson S. Román
United States District Court
300 Quarropas Street
White Plains, New York 10601

Re: Nurse Anonymous v. Good Samaritan Hospital et al., 20-cv-03119 (NSR)

Dear Judge Roman:

I represent Plaintiff in this action and respond to the defendant's request for a pre-motion conference on the defendants' proposed motion under Rule 12(b)(6). We hope this motion will not be necessary,.

1.    Anonymity.

Plaintiff always accepted that the Court's would need to consent to proceed anonymously. However, what if Plaintiff had moved for such relief with the filing of the complaint? Would not the court have set the motion aside for the appearance of counsel? We assumed so. We intend to make the motion and will forthwith. Perhaps there was another way to ask for anonymity in advance of filing, but it is not a typical request, and I assumed that the parties could sort it out when there was an appearance.

As far as the balancing factors that are part of any such motion, we believed that Plaintiff's medical condition, at a minimum, would allow anonymity. Plus, in the complaint, a patient to which plaintiff tended – who infected Plaintiff with Covid-19 – is identified by circumstance. We believed that a third-party patient's diagnosis and treatment (and death) would be a reason for anonymity. Since the defense would appear to disagree that a patient is not a basis for anonymity, we will move for such relief upon a briefing schedule.

2.    Bon Secours, the Westchester Foundation, and their Status as an Employers (or Joint Employers).

Plaintiff contends that all three of these entities are his employers; they work in tandem. Bon Secours' headquarters, indeed, is located at Good Samaritan. While the base of operations is

1

not dispositive, it points in Plaintiff's direction, and Plaintiff's allegations read such that all three defendants were his employers. Indeed, the best investigation I could undertake indicates this connectivity; if there is a question, at a minimum, Plaintiff should have a modicum of discovery. As we alleged, the Westchester Foundation owns 60% of Bon Secours. The CEO of that Foundation – unless we named the wrong corporation by mistake – published a statement on Good Samaritan's website (since taken down) that all of its hospitals were committed to the proper use of Personal Protective Equipment, which was abundantly in stock – a statement obviously false. If the majority owner of an employer sends such a message, it is complicit in the defalcations of duty that it owed plaintiff.

While perhaps I have named the wrong corporation as to "Westchester County Health Care Corporation," I could only find the Foundation on the Secretary of State website. Perhaps the real defendant is a "corporation" in the loosest, relaxed manner. If I should have named a corporation other than the Foundation, that is a modest issue to correct on an amendment, which we can make after limited discovery – or even discussion with counsel.

As to Bon Secours, yes, we must allege the wrongdoing of each defendant, and we have. For example, the Chief Nursing Officer who contacted Plaintiff inviting return to the hospital (just without proper PPE and no accommodation) is on the board of Bon Secours. Bon Secours funds Good Samaritan. Why would this CNO get involved in a purely Good Samaritan issue if Bon Secours were not responsible? There might be a reason, but not one that a court may resolve now.

3. <u>The Alleged Failure to State Disability-Related Claims</u>.

The Rehabilitation Act allegations are sufficient and Plaintiff is also awaiting a right-to-sue letter from the EEOC on a claim under the Americans with Disabilities Act. For reasons that should be obvious, the EEOC is very slow on these matters now, and the best Plaintiff could do was get a telephonic appointment to request a right to sue letter in July. But Rehabilitation Act claims have no exhaustion requirements – at least not that the defense indicates. Plaintiff has alleged that (1) Covid-19 in itself is a disability; (2) plaintiff did become Covid negative, but had a record of Covid-19; (3) plaintiff was perceived to be disabled by Covid-19 and refused any accommodation. Moreover, (4) Plaintiff alleged the underlying conditions that make Covid-19 a particular risk for this Plaintiff (chronic kidney disease, about which Plaintiff notified a supervisor by text). All of these conditions qualify as disabling under the Rehab Act. Any exhaustion requirement under that Act – which we are not aware of – the defendant has the burden to show. It suggests exhaustion requirements, but mentions none.

Meanwhile, if the Court were to decide the motion, the issue would become moot as soon as the EEOC issues a right to sue letter.

An unpublished decision wherein the plaintiff was pro se, *Smith v. N.Y.C. Dep't of Educ.,* 2019 WL 6307471, at *8 (S.D.N.Y. Nov. 22, 2019) does not illuminate this issue in any manner. *Smith* has no relation to this case, and this Court must be aware that cases brought by pro se plaintiffs are a red flag. With no one with legal knowledge to represent them, a pro se plaintiff has vast difficulty in navigating the legal landscape. To cite an unpublished case involving a pro se plaintiff is scratching at the bottom of the barrel.

Given the newness of Covid-19, it would not be appropriate to rule on these issues without discovery.

4.  <u>Adverse Employment Action.</u>

Defendant cites the ancient and unpublished *Pimentel v. City of N.Y,* 74 F. App'x 146, 148 (2d Cir. 2003) (summary order) to support the contention that a denial of a transfer is not an adverse employment action if "the terms, privileges, duration, or condition of a plaintiff's employment do not change." But that is somewhat backward logic. It does not follow that because an actual transfer is not an adverse action that the *lack* of transfer is also not adverse. Had Plaintiff been transferred somewhere with the same terms and privileges, plaintiff wold not have needed to state a claim. However, here, Plaintiff needed to be provided OSHA-required Personal Protective Equipment so as not to be reinfected with Covid-19. The defendants refused this accommodation, as it did the request to transfer to one of the non-Covid units at the hospital. Plaintiff alleges the latter accommodation was recommended, or at least suggested, by the hospital's on-site occupational nurse. It was a reasonable proposal, but the defense doesn't want this case to be any semblance of precedent for nurses' lives in a pandemic. Its position is unconscionable.

The defense states, "Plaintiff does not allege that a transfer to another unit would have resulted in any materially different terms and conditions of employment—she would have remained a nurse caring for patients with no alleged change in compensation. That's true. But it's the failure to transfer to an available job that is the issue, and a failure to transfer to an available job that could accommodate is a violation of the ADA, and by extension, the Rehabilitation Act. *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89 (2d Cir. 1999).

5.  <u>Constructive Discharge.</u>

The defense suggests that Plaintiff cannot show that the accommodation requests were reasonable; it argues that the hospital was dealing with an "unprecedented pandemic." The unprecedented pandemic is a reality, but it does not follow logically that a nurse must risk his or her life without accommodations in a pandemic. That is at least a factual question that the Court cannot answer on summary judgment, let alone a motion to dismiss.

The hospital had the means to accommodate. Indeed, Plaintiff might have been fired for *not* following hospital procedure or *not* complying with OSHA standards. Instead, Plaintiff's insistence on either a non-Covid unit or an accommodation with proper personal protective equipment – consistent with hospital policy in regular times were reasonable.[1] No Court can decide this on a 12(b) motion. Plaintiff was in the plight of putting personal health – plus that of plaintiff's elderly parents – at risk to keep the nursing job. To boot, the hospital put plaintiff at risk of infection in the first place by not testing a patient it surely knew was Covid positive – at least as we allege.

---

[1] Plaintiff would have accepted any mask that fit, including the N-95, which few nurses were getting. OSHA requires an annual "Fit Test" to determine the proper "respirator" mask, and defendants simply tested in order to comply with the OSHA regulation, but never made sure any nurses – let alone plaintiff – had the respirating mask he or she needed. In the usual circumstance, this was merely an OSHA violation that the defendants could sweep under the rug.

Taking the allegation as true, as any Court must, it is further evidence of bad faith on the part of defendants.

The defense contends that the hospital could not protect Plaintiff with proper PPE – PPE that the CEO announced was fully available at its hospitals just days earlier. But there is no "pandemic exception" under the Rehabilitation Act or the ADA. Who is to bear this burden – corporations of actual, living people. Nurses and health-care workers in this crisis have been spit upon – as if their health or legal rights have no meaning because of the pandemic. Cheer them at seven, but forget about protecting their lives as you go to sleep at eleven. Nurses and doctors have died because of inadequate PPE. The defense suggests that a twenty-something nurse just out of school must risk life and family health as an unstated job requirement. That is untenable, and at least a vast question that is not fodder for a pre-answer motion to dismiss. If "Good Samaritan's failure to grant these requests were justified by its limited resources and extraordinary, unprecedented need," that is not a legal question; we deny it in any case.

Defendants admit that to establish a "constructive termination," the pleading must set forth conditions that "are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Terry v. Ashcroft*, 336 F.3d 128, 152 (2d Cir. 2003) (finding constructive termination). Terry further noted that

> upon arriving at the deportation office, [Terry] spoke with his new supervisor who informed him that she had no idea that he had been reassigned to her office, and that when she contacted . . . a personnel management supervisor at the district office . . . he responded by stating: "you mean to say he really showed up?" The import of these comments is not only in the words themselves, but in how a reasonable person in Terry's position might have viewed them in conjunction with the other circumstances of his employment, and whether such a person would have felt compelled to resign as a result.

*Id.* at 152.

*Terry* suggests that much more equivocal reasons are subject to a constructive-discharge analysis. For goodness' sake, what must a plaintiff allege other than personal health and safety – plus that of Plaintiff's parent's – were at risk if Plaintiff returned to work under defendant's demands? Gosh – Plaintiff contracted Covid-19 because (as we allege) defendants' gross negligence in failing to test a patient who was brain dead and Covid-positive. If the hospital had tested the patient, at least Plaintiff would have been provided additional PPE. But the hospital, despite all the patient's signs of Covid, for some reason, refused to test him. Why was this? A lack of tests? The clear evidence that the patient had Covid, would waste a test? A combination of both factors? The failure to test this patient for Covid, for whatever reason, placed Plaintiff in harm's way. "First, do no harm," it is said, but, at a minimum, a hospital in this situation must allow any nurse to protect his or her life, plus that of the family. The actors at Good Samaritan and Bon Secours refused this. Yes, they asked Plaintiff to return to the facility, but the reason Plaintiff left was the health risk and the failure to accommodate. Offering plaintiff a job that is identical to the dangerous job plaintiff held before quitting does not speak to good faith. It speaks to covering its guilt by offering a proposition that it knew Plaintiff would not – and could not –  accept. Notably,

when the Plaintiff offered to return with proper accommodation, there was no interactive dialogue, just a big, fat no delivered by Bon Secours' Chief Nursing Officer.

6. <u>Alleged Failure to State a Retaliation Claim</u>.

In evaluating Plaintiff's retaliation claim, please let us not forget that, as long ago as 2006, the Supreme Court clarified the "adverse action" prong in *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 61 (2006), which is modest: a reasonable likelihood that the employer's action would "deter the charging party or others from engaging in protected activity." Here, the complaint alleges that when Plaintiff demanded the PPE that Plaintiff needed to protect health, his supervising nurse accused him of "playing games" with the hospital. But this young nurse had merely pointed out that (a) plaintiff had contracted Covid from the hospital; (b) had improper PPE, and (c) wanted to protect health and that of Plaintiff's family. Defendants cornered Plaintiff into accepting an assignment detrimental to the plaintiff's and Plaintiff's family's health with no accommodation. Plaintiff, theretofore an excellent employee, was sharply accused of "playing games" by insisting on what OSHA requires. To be accused by a supervisor of "playing games" in asking for OSHA-required PPE: that surely would deter a reasonable employee – certainly one in Plaintiff's situation – from making any EEO complaint or complaint of lack of accommodations. The CNO confirmed this the next day by refusing his compromise in the guise of asking Plaintiff to return to work.

7 <u>Alleged Failure to State Plaintiff's Intentional Infliction of Emotional Distress</u>.

I admit that bringing this claim was a close call for me and agree that the standards are high for any plaintiff to prevail. I believe these facts support IIED – defendants put Plaintiff in harm's way, he caught Covid. Then defendants refused accommodation. If it avoids motion practice on other issues – except the anonymity, which is Plaintiff's obligation to prove – we will withdraw this claim. If we must waste precious time on matters that (1) no court can resolve on a motion to dismiss (if even summary judgment); and (2) that Plaintiff reasonably alleges under the standards of the cases cited in this letter, as well as *Littlejohn v. City of N.Y.,* 795 F.3d 297 (2d Cir. 2015), then we will fight to preserve this claim.

Sincerely,

*Greg S. Antollino*

Gregory Antollino

Cc:   Allison B. Gotfried, Brian Clark