UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

NICHOLAS EARL,                                          AMENDED
                                                        COMPLAINT

       Plaintiff,

                                                        20-cv-03119-NSR

      -v-                                         JURY TRIAL DEMANDED

GOOD SAMARITAN HOSPITAL
OF SUFFERN NY, BON SECOURS CHARITY
HEALTH SYSTEM and WESTCHESTER
HEALTH CARE FOUNDATION, INC. dba
WESTCHESTER HEALTH CARE NETWORK, INC.

       Defendants.
------------------------------------------------------------X

      M. Michel's eyes were fever-bright and he was breathing wheezily[, denoting as he felt] "a bit off color," he had gone out to take the air. But he had started feeling pains in all sorts of places—in his neck, armpits, and groin—and had been obliged to turn back and ask Father Paneloux to give him an arm. "It's just swellings," he said. "I must have strained myself somehow."

      Leaning out of the window of the car, the doctor ran his hand over the base of Michel's neck; a hard lump, like a knot in wood, had formed there. "Go to bed at once, and take your temperature. I'll come to see you this afternoon."

Albert Camus, The Plague, 1948, Vintage Edition, 1991, p.25.

      The evil that is in the world always comes of ignorance. . . . On the whole, men are more good than bad; that, however, isn't the real point. But they are more or less ignorant, and it is this that we call vice or virtue; the most incorrigible vice being that of an ignorance that fancies it knows everything[.]

Edgar Allen Poe, Berenice, 1835.[1]

      Any disease that is treated as a mystery and acutely feared will be felt to be morally, if not literally, contagious.

Susan Sontag, "Illness as Metaphor," Picador, 1988, p.2.

---

[1] Available at https://poestories.com/read/berenice (public domain, visited 9/19/20.)

SUMMARY

1.      Plaintiff is a nurse whom Defendant Good Samaritan – a hospital governed by co-employers Bon Secours and Westchester Health Care Network – and became infected with COVID-19. Someone or others at Good Samaritan placed him in the room of a man dying of COVID, but purposely not tested for COVID.  Had the patient – who died of COVID the next day. If the patient had been tested, Mr. Earl would, per Good Samaritan's procedures, have access to adequate personal protective equipment, including a negative-pressure room, to avoid infection.

2.      Instead, Mr. Earl's overnight stay with the patient caused him to get COVID. The patient, who was a person with special needs, had not seen his family for enough time to know his condition or that he needed an advocate. But after the man died, his family demanded the hospital test the body for COVID-19. Defendant Good Samaritan[2] notified Plaintiff of the patient's positive test. Mr. Earl also tested positive. Insofar as the untested patient was the only COVID+ person that the Plaintiff attended to without minimal precautions. Since he came down with symptoms almost immediately after that, the infection came from the patient.

3.      Nicholas was out for a period of quarantine and to recover from the infection, which did not pass easily. He had wrenching flu for more than two weeks and still has Amsonia – a loss of his ability to smell and taste.

4.      Because Plaintiff has a comorbid health condition, chronic kidney disease – and the kidneys are particularly vulnerable to COVID – it was unsafe for him to attend to immunocompromised patients going forward, as he informed one of his supervisors. Plaintiff could have tended to other patients, however.

---

[2] Unless otherwise indicated, "Defendant," without a particular designation of Westchester Health or Bon Secours, shall refer to Good Samaritan, as this was plaintiff's place of employment.

5.     For now, one could say Plaintiff is doing "well," but he suffered classic symptoms of the infection, physical and emotional; he is lucky to be young enough to utilize his parent's insurance for his health care. He also remains afflicted with anosmia – the inability to smell or taste. When he eats, it feels to him as if he is eating nothing. There is no telling what long-term effects are in store for him. Still, nothing would be waiting in the store had Good Samaritan successfully snuck the infected patient into the room of normal pressure – and knowingly led Plaintiff there – allowing viral particles to fly free and infect Mr. Earl.

6.     It was a shameful moment for which there can be no medical explanation, but the actor(s) at Good Samaritan lied by omission. There was no reason *not* to test the patient who died except that to do so would not place the patient in a negative pressure room and otherwise alert nurses to take proper protections.

7.     Good Samaritan led Mr. Earl into harm's way. Even after he was better when Mr. Earl expressed that – based on his doctor's opinion –he should not be exposed to immunocompromised patients because his chronic kidney disease could worsen if he were exposed to COVID again. But the Hospital remained stubborn and refused to accommodate him. Not only would it provide him a proper respirator – which it said it had in stock – it also did not reassign him to another job without exposure to COVID patients, and there were many. The Hospital's Occupational Health Nurse even suggested the Hospital should assign him to a non-COVID unit.

8.     Long before he returned, he notified Good Samaritan – which is controlled and funded by Bon Secours and Westchester Health – that he had kidney disease and that further exposure to COVID-19 patients could exacerbate it. Weeks later, after he tested negative and returned ready to work, the Hospital did not ask for medical documentation; it just told him he had to work against his doctor's advice. This omission demonstrated the Hospital's nefarious intent.

9.      Defendants refused to reassign him to non-COVID patients, even though this would have been simple. They refused to supply him with a respirator that fit his face – he has a prominent jaw – that would protect him from infection. The respirator he needed – at least in proximity to COVID patients – is known as a PAPR – an atypical, but not unusual respirator, whose initials stand for "powered, air-purifying respirator." (Pronounced *PAP*-er.) The Hospital gave him conflicting reasons as to why he could not have a PAPR – no batteries, no cartridges, but those *accouterments* the Hospital could readily have obtained.

10.     Or, more likely, defendants were lying about the PAPR it supposedly had on site. It didn't want to buy another, despite that OSHA rules required it.

11.     Defendants' actions were inexplicable as anything but motivated by hubris, optics, and greed. It is more than likely that the Hospital chose chosen because it wanted a man in the ICU, where the COVID patients the Hospital sent (mostly) to die. (One younger, celebrated patient was released among cheers recently after five months on the respirator.

12.     It also seems that the defendants wanted a male to attend to the dying special-needs patient. Plaintiff makes this inference because the Hospital flouted its usual procedures in taking him out of turn for the particular assignment.[3]

## THE PARTIES

13.     Plaintiff is a resident of Rockland County, New York.

14.     Good Samaritan Hospital of Suffern, N.Y., is a non-profit corporation organized under the laws of New York with offices in Suffern, New York. It is part of the Westchester Medical Health

---

[3] There was a reason for faux-gendering an anonymous plaintiff in this case. When he thought it prudent to remain anonymous, he would have been easily identifiable, given the relatively paucity of male nurses at Good Samaritan. He abandons any request for anonymity insofar as the stigma of a COVID infection – as well as some reported attacks on nurses – have abated.

Center Network (WMC) and the Bon Secours Charity Health System Affiliated Group, a non-profit health corporation whose principal place is at Good Samaritan in Suffern. WMC owns a 60% share of Good Samaritan. The other 40%, upon information and belief, is owned by Bon Secours. WMH holds majority control over Bon Secours and supplies funding to Bon Secours and its affiliates. WMH's logo is on Bon Secours's website. Bon Secours, in turn,  is the umbrella corporation for Good Samaritan and several other hospitals in the northeast.

15.     Bon Secours' Mission "is to make visible God's love and to be good help to those in need, especially those who are poor, vulnerable, and dying. As a system of caregivers, we commit ourselves to help bring people and communities to health and wholeness as part of the healing ministry of Jesus Christ and the Catholic Church."

16.     Bon Secours revenues are only slightly higher than its expenses, but it has an endowment exceeding $51,000,000, according to the latest IRS Form 990, and $6,459,000 of other investments. (Good Samaritan, part of Bon Secours, has not filed a tax return since Bon Secours acquired it.)

17.     Westchester Medical Health Foundation, Inc. (WMH) does business as the "Westchester County Health Care Corporation" – or one could say vice versa. The latter corporation has registered with New York and has offices in Valhalla, New York. The former perhaps calls itself a "corporation" – in the general sense, perhaps; unusually, there is no such name registered with the New York Secretary of State. Nevertheless, it has an endowment of  $24,358,374, according to its latest 990. These numbers will be relevant if the defendants contend it was an undue burden to accommodate Plaintiff.

18.     All defendants receive federal financial assistance, including but not limited to Medicaid and Medicare.

JURISDICTION AND VENUE

19.     Jurisdiction is proper in this district under 28 USC § 1331 in that this action arises under

the Constitution and laws of the United States, among them the Rehabilitation Act – which requires

no conditions precedent – and the Americans with Disabilities Act, for which Plaintiff just this

week received a right-to-sue letter. State claims are pendant and arise under the same common

nucleus of operative fact.

20.     Venue is proper, at a minimum, in this district under 28 USC § 1391(c)(2) as Defendants

reside in this judicial district.

FACTUAL ALLEGATIONS

21.     Plaintiff repeats and realleges the previous allegations as if fully set forth herein.

22.     Plaintiff is a graduated in 2018 with a Degree in Nursing. He started employment as a nurse

at Samaritan and worked there in the surgical intensive-care unit beginning in October 2018. His

Nursing Manager was Megan Hayes. Ranking above Hayes was Chief Nursing Officer Phyllis

Yezzo.

23.     While Plaintiff was working at Bon Secours – from his start date until his departure when

Samaritan and Bon Secours constructively discharged him by refusing to accommodate him – he

had no problems at Samaritan. He received unbidden compliment cards from five or six patients

and had at least one early evaluation, and it was uniformly positive.

24.     Early in March, Plaintiff heard on television that someone famous had died – his first

information about COVID. No one at the Hospital spoke of the possible pandemic, even though

there was sufficient information (for the Hospital) to make preparations. As March progressed,

there were, upon information and belief, ten cases at Samaritan.

25.     When COVID patients continued to arrive, Samaritan did the medically proper thing and

put suspected patients in negative-pressure rooms. There, the controlled atmosphere avoided the shed of the virus. The staff intubated some patients to put them on a ventilator, and when doing this, the nurses wore the proper N95 masks, medically appropriate under OSHA guidelines.

26.     Plaintiff's only training was a PowerPoint presentation about the respirators and the pressure rooms. It seemed rushed, but he adapted.

27.     Per Samaritan's procedures – as required by OSHA – Plaintiff underwent a "fit test." This test is intricate: the testers place various masks on the testee's (i.e., the nurse's) face. The nurse then smells items offered by the tester. The purpose of the test is to ensure nothing airborne seeps through into the mouth and lungs; otherwise, there is no proof of a proper seal to avoid the spread of viruses or bacteria or other pathogens through any cracks or gaps in the mask.

28.     Plaintiff fit-test originally indicated his need for a PAPR; the result the Hospital duly noted and ignored. When he returned to work, he tried to fit-test twice with an N95 mask, but he could still smell and taste, so the typical N95 did not operate to avoid the spread of the virus.

29.     He repeatedly asked for the PAPR.

30.     He got no PAPR. Given that he fit tested for a PAPR in October 2019, the Hospital, per OSHA regulations, was supposed to give him one. Assuming the Hospital was not lying when it said it had a PAPR or two on-site but had no batteries or cartridges, it could have purchased one. At the time, the PAPR cost about $1,700, available on Amazon.com. Usually, its value is $300, and the Hospital could have purchased when Plaintiff first fit tested for the PAPR. Cartridges are required, and they last about five years at about $125 a pop.

31.     Defendants did not give Plaintiff a PAPR. Instead, the hospital tester estimated his face for the much cheaper N95, which he nevertheless never got. However, Samaritan registered his on a card, saying that he *would* fit for a PAPR, even if one would not supply it. The Hospital holds onto

the certificate to show compliance with OSHA guidelines, but the card means nothing: Samaritan

never gave Plaintiff the protection he tested for.

32.     Samaritan and Secours pay lip service to its mission "to make visible God's love and to be

good help to those in need." The Westchester Network has no religious mission, but it pays lip

service a commitment to PPE. At the height of the pandemic in New York, C.E.O., Michael D.

Israel wrote, on behalf of his Network on the Samaritan website:

> WMCHealth has adequate PPE, ventilators, medical equipment[.]. .WMCHealth has
> proper PPE on hand. . . . Our care teams have been extremely conscious about the
> appropriate use and conservation of PPE and are working under current CDC guidelines
> for PPE use.

See https://www.goodsamhosp.org/news/message-from-president-and-ceo-michael-d-israel-1414

(the undersigned last visited with this specific message on April 17, 2020). One of the defendants

took the notice down, then put back up in May or June. It appears now to have been deleted.

33.     The truth is, however, that insofar as Samaritan would not provide Plaintiff a PAPR – it

was not true that "WMCHealth ha[d] proper PPE on hand." Nor was it true that the Hospital's

"care teams have been extremely conscious about the appropriate use and conservation of PPE."

Notably, though subject to OSHA regulations, the Hospital invoked the continually watered down

and fluffed up Center for Disease Control "guidelines," which are often political statements. Still,

even accepting the CDC guidelines as proper and sufficient, the Hospital failed.

34.     On March 9, 2020, with only 500 COVID-19 infections in the United States, the CDC

published guidelines for workers whose recommendations for social distancing of at least 6 feet

and Personal Protective Equipment ("PPE") for workers.

35.     The same day, March 9, 2020, OSHA released its guidelines, recommending that

companies should offer surgical masks or respirators to workers who were at risk of infection with

8

COVID-19, especially those that worked in close quarters:



**Personal Protective Equipment (PPE)**

Employers are obligated to provide their workers with PPE needed to keep them safe while performing their jobs. The types of PPE required during a COVID-19 outbreak will be based on the risk of being infected with SARS-CoV-2 while working and job tasks that may lead to exposure.

(Screenshot from OSHA guidelines, March 9, 2020.)

36.     The special-needs patient was the only one that Plaintiff sat with all night on the patient's last night. He had classic symptoms of COVID.

37.     First, the patient had pneumonia and had earlier been placed into a negative-pressure room then put on precautions for COVID-19.

38.     Then suddenly, the Hospital did not see the utility of testing a special-needs patient, 59 years of age, and his family could not object or advocate for them as they couldn't even visit him.

39.     The doctor told Plaintiff that if one has pneumonia, it must be on both sides of the lungs to justify using a COVID test. This potential diagnosis for testing was purely pretextual.

40.     This explanation was nonsense. No matter the lung criteria, the doctor seemed unusually concerned with COVID is a multi-organ disease with numerous symptoms. The Hospital did not test the patient because it was almost sure he was COVID positive, and the Hospital wanted to avoid exposing this knowledge: The patient was going to die absent extraordinary measures, and he was 59 and had special needs.

41.     Any competent doctor would have known that a patient with a fever of 103, sweating profusely (diaphoretic) and brain stat – meaning he was almost brain dead. But he was just left there with Plaintiff to die.

42.     The patient's oxygen saturation was in the mid-8mid-'80; the Hospital did not fit the patient with a non-rebreather mask – a device that allows the flow of oxygen rather than the mere feed of oxygen. In other words, he wasn't even given oxygen except for optic and perhaps palliative

purposes – the air went into his throat, but he wasn't absorbing it. His blood oxygen level was a measure of how much $O^2$ the red blood cells were carrying to the brain. To have a ratio of oxygen within the '80s is not like getting a "B" as in school  – it is undoubtedly an "F." A healthy percentage is 95-100%.

43.     Though the patient was on supplemental – again, purely fed, not recycled – oxygen, Plaintiff put a different mask on his face. He was still not getting enough oxygen, meaning that the patient needed a rebreather mask, but the Hospital refused to provide by quietly ignoring his symptoms and not testing him. It seemed clear to Earl, a young, intelligent nurse, that something was grossly negligent, if not worse.

44.     Plaintiff spoke to the day nurse and his night supervisor. He told them that the patient did not have any protections, and he could not get a mask or for Plaintiff's protection.

45.     One of these nurses said, as late as the end of March 2020, "I've lived through three of these end-of-the-world pandemics, and we'll be ok."

46.     He texted his direct manager, Megan Hanys, and told her that he lives with senior parents who are hypertensive, diabetic, and obese: risk factors that can make this virus deadly should they contract it.

47.     Plaintiff also told Hanys that he had had Chronic Kidney Disease since he had been an infant; he reminded her that the reports from China show the virus can shut the kidneys down.

48.     But Hanys did not fulfill Bon Secours' religious, charitable mission, or even, in a mostly secular and objective way, see the obvious. Condescendingly, she told Plaintiff to calm down.

49.     Plaintiff then went above her and told the charge nurse that the patient – and, thus, he – needed better care. That nurse, in turn, came into the room, looked at the patient's chart, and remained silent. The charge nurse did not refute Plaintiff, though likely there was nothing the

charge nurse could do.

50.     Plaintiff, many times, started looking for supplies to protect him. He found one surgical mask, though, as part of his duties, he had to suction virus-laden gunk out of the disabled patient's windpipe.

51.     Another nurse also assigned to the patient told Plaintiff she was sure COVID was at play.

52.     All the N95 masks were being kept with the supervisors or designated only for suspected COVID-19 patients. Plaintiff spoke to Marie Van DeVere, the supervisor that evening, and said how uncomfortable he was to be taking care of this patient, his air passages fully exposed. Plaintiff noted he could not understand the rationale for not testing this patient for COVID-19. At least a positive test would have allowed some protection for Plaintiff, and a less painful death than the Hospital allowed the patient.

53.     Plaintiff left his shift after the evening. Upon returning to work in two or three days, he learned the patient had died of COVID.

54.     Plaintiff went home, was swab tested, and started suffering COVID symptoms. After waiting five days for the result, he learned he tested positive.

55.     He followed CDC guidelines – i.e., as to when to go in and out of isolation. Then he called the Hospital in a week.

56.     The CDC rules require discontinuing isolation only after (1) seven days from the onset of symptoms; (2) and on the eighth to be without fever for three days without Tylenol and have a general improvement of symptoms.

57.     He called his primary care doctor, especially given that he has kidney disease, and his doctor told him that given his infection and health condition, he should not be in contact with immunocompromised people.

58.     He stayed in isolation from approximately March 16-30, 2020.

59.     He tested negative, but he felt terrible after seven days and stayed out of work until April 7 (approximately) when he felt well enough to work.

60.     He reported to the command center, which Samaritan converted into a fit-testing station. Mr. Earl said that it is "my first night back, and I have been infected." Both masks available did not work because he tasted the solution, yet he could not get a PAPR.

61.     He worked two nights with an N95 respirator. The first night, the mask would just come off his face. There was no one left to whom he could complain, except OSHA, which he did.

62.     The next day he went to the command center, and, still, there were no new masks.

63.     His supervisor, Nurse Adrianne, said, "Didn't you get fit tested yesterday."

64.     Plaintiff replied, "Yes, but the mask was too small."

65.     Adrianne contradicted him as if to refute reality, saying, "You passed yesterday. What games are you playing?"

66.     The suggestion of "game-playing" was purely to insult and demean Plaintiff, who contradicted her and said, "No, [the fit tester] just took the best one available. I've been infected already, and I just want something to work for me!"

67.     It wasn't much to ask.

68.     Adrianne replied incredibly, "What you want us to do about it?"

69.     Plaintiff said, "All I want is a mask that fits."

70.     Adrianne had no answer. She wanted the Plaintiff to bend to her will or to quit.

71.     An occupational health nurse added, "He needs the PAPR."

72.     Adrianne said, "We don't have any. We need to find something else that will work." But there was no search. Plaintiff was absent for three weeks, and the Hospital did nothing during that

time to accommodate him. Indeed, while isolated, Plaintiff spoke to his regular manager about the PAPR, and the manager said, "Just get fit tested again." Plaintiff's response was irrefutable: "How can I be accurately fit-tested since the test measures smell and taste?" At the time plaintiff had very little smell or taste – the same is true today.

73.     Amazon delivers quickly, and Plaintiff could have gone home or done something else in the meantime, while Bon Secours fulfilled its mission to the needy – in this case, Plaintiff. It had already failed the special-needs adult.

74.     The occupational nurse who stood by (and advocated) for Plaintiff said to Adrianne, "Can't he go to a clean unit?" She was referring to a non-COVID unit.

75.     There had been a unit opened for non-COVID patients in a building formerly used for chronic dialysis patients.

76.     Adrianne's response to the occupational health nurse (who knew better) about Nicholas: "He's a critical care nurse." In other words, because Good Samaritan hired him as a critical care nurse – and despite that Samaritan put him in more harms' way than other patients – he would not receive accommodation with a less dangerous job. This refusal was not only a pretext – Plaintiff easily could have been transferred – but a failure to engage in an interactive dialogue to find an accommodation was not only a violation of the law but is evidence of discrimination. Adrianne did not want any accommodations for any nurses, nor did the Hospital.

77.     Plaintiff easily could have been accommodated. ICU is a challenging assignment, but there were other jobs of lesser risk to Plaintiff for which he was qualified, given his nursing education and training.

78.     So it was a Hobson's choice for Plaintiff: risk reinfection or quit. That was where Samaritan was angling him. He called his parents about this untenable situation, and they agreed he should

resign.

79.     He sent a resignation letter that Wednesday morning. He gave two weeks-notice and emailed again to follow up.

80.     He made clear he would not work in I.C.U./critical care unless he got a PAPR or work in a non-COVID unit. He added, "Let me know if we can resolve this."

81.     Adrianne's response was first that there was nothing to do to resolve this. All along, she wanted to see him go for creating a ruckus by getting COVID and demanding a safe workplace. "I'm sorry you're leaving," she said, disingenuously, but I understand."

82.     Plaintiff's occupational health nurse (at Samaritan) said he couldn't be taking care of critical patients without a proper mask. Adrienne violated her oath and didn't give a damn about the smarter occupational health nurse.

83.     As far as working in one of the "clean units," this would not have been contraindicated. At the time, the Stanford Medical School reported that after a 14-day quarantine, someone "who has been released from quarantine is not considered a risk for spreading." *See* https://stanfordhealthcare.org/stanford-health-care-now/2020/novel-coronavirus/faqs-about-covid-19.html (citing CDC guidelines and last visited on April 17, 2020). That was what was known then.

84.     Little has changed. Several months later (and unrelated to this case), a Hong Kong man was diagnosed with COVID a second time. But epidemiologists were quick to report that this reinfection was not a cause for panic. *See* Kai Kupferschmidt, <u>Science</u>,  Aug. 24, 2020. Last seen on 9/19/20 and available at *https://www.sciencemag.org/news/2020/08/some-people-can-get-pandemic-virus-twice-study-suggests-no-reason-panic.* Finally, the CDC in a memo discussed the issue of previously infected health care professionals. It said that precautions would depend on the

worker's symptoms. *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html (last visited 9/19/20).

85.    The facility continuously required staff to reuse N95 masks for a workweek or 36 hours, regardless of manufacturers' recommendations or concerns raised by staff. Samaritan instructed the nurses to place contaminated covers in a lunch bag, then bring the baggies home, maybe cleaned and brought back to the next shift, and reused again.

86.    The Hospital gave staff one plastic gown per shift and instructed to "wipe it down" between patients with antimicrobial wipes and hang it up to air dry.

87.    These are one-piece gowns donned and doffed by bringing the neck over the nurse's head, past his face. This action, done multiple times a day, putting the wearer further at risk of contamination.

88.    Staff raised concerns that this procedure was unsafe, but they were shamed by management that a wipe down made everything disinfected. But in wiping down, the antimicrobial wipes – which are not for use on skin – would unavoidably touch the nurses' skin. Many reported irritation due to fumes and stinging.

89.    As of 4/14/20, there were 65 staff members out sick due to a lack of appropriate PPE.

90.    As long as he wore a proper mask, Plaintiff should have been safe to himself and others. His mouth and nose would be covered, and he wasn't coughing or sneezing anymore. His hands would be clean. He had spent time enough in quarantine and had tested negative.

91.    The Hospital not only refused accommodation but discriminated against him directly by refusing to reassign him *and* refuse to pay a measly $1,800 to protect a young, dedicated, good nurse's life.

92.    Without the PAPR (or the transfer) plaintiff could not work. The ICU was more dangerous

for him because he knew to avoid any immunocompromised patients, which populate the critical

care portions of the Hospital.

93.     After he quit, he got a call from Phyllis M. Yezzo, D.N.P., RN, CPHQ, NEA-BC, SVP,

Patient Care Services, and Chief Nursing Officer. She is also a professor of nursing at New

Rochelle College. Likely, a lawyer told her to make the call

94.     Yezzo asked Plaintiff to return, although in what capacity she did not say. She did say that

the PAPR's at the Hospital needed the $125 cartridges mentioned above, so she was steering him

into her decision that he would get no PAPR. But the cartridges could easily have been ordered,

if, indeed, there were no cartridges. Yezzo was probably lying because if the Hospital had no

PAPR's, it was an OSHA violation.

95.     The Hospital probably had none and kept changing its story. <u>But Good Samaritan could

have ordered a cartridge</u>! Plaintiff, wanting to be polite, ended the call saying he'd think about it.

96.     The next day, he responded by email:

> I have thought about our phone call thoroughly over the past day. The whole
> reason I decided to leave Good Samaritan Hospital was because I felt
> unprotected from COVID-19. I was already infected once while working there,
> only to return to work to be told I would not have a PAPR device, or a properly
> fitting mask available for my use. While on the phone, you stated that only
> droplet precautions are required while helping patients infected with the virus.
> As an ICU nurse in this pandemic, I am exclusively working with patients that
> are on ventilators and need to be suctioned, creating aerosol particles as outlined
> on the CDC website. You also stated that your glasses were fogging with the
> N-95 mask on. I was confused as to why you [we]re wearing a respirator if you
> believe[d]    staff entering    COVID    patients'    rooms    only
> require droplet precautions. [This was a reference to a phone conversation in
> which Yezzo tried to convince Plaintiff that the N95 was not worth the bother.]
> I feel that in the 3 weeks I was isolated at home with COVID-19, the Hospital
> could have invested in a PAPR device for my protection, or at least replaced
> the  "cartridges"  on  the  broken  ones,  as  you  said.  A  reasonable
> accommodation would be to place me in a NON-COVID unit. Adrianne already
> made it clear that, because I am a critical care nurse, this will certainly not
> happen. This all being said, I will not be returning to Good Samaritan Hospital
> unless a PAPR device is made available, or I would be exclusively placed on a
> 'clean' unit. If not, I will be applying for COVID enhanced unemployment

benefits and start looking for new employment elsewhere. I feel that I have been more than fair under the circumstances, even after the Director of Nursing [Adrianne] insulted my integrity and disregarded my safety. I will wait until 5 P.M. Wednesday, April 15th, for your answer. Thank you for your time.

97.     The young nurse with integrity told it like it was – and called Yezzo out on her contradiction that nurses didn't need N95's – a pure lie – yet she used one for herself.

98.     Her response, again, a lie: "Thank you for getting back to me. I was hoping you would reconsider returning to GSH.  I am disappointed you have **not reconsidered.**  Please know we are open to exploring your return in the future should you change your mind."  (Emphasis added.)

99.     Should Plaintiff have "reconsidered" his wish to be alive and stay safe? Nurse Yezzo, indeed, should be "disappointed," mostly in herself. She discriminated against Plaintiff and put him in a position such that – knowing he was a good nurse – would put his life in danger. Both were violations of her oath as a nurse.[4] Even if she acted as a mouthpiece to be sure that Plaintiff quit and the Hospital did not fire him, she failed in Bon Secours' stated mission to God and the sick. She should be ashamed, and if not, the Hospital should pay.

100.    While Defendant indubitably tried to fudge the facts such that it would not fire Plaintiff, a constructive termination this surely was. Plaintiff – to use Nurse Yezzo's self-righteous words – was "disappointed" that Bon Secours had "not reconsidered."

101.    Defendants lost an excellent young nurse, who has suffered much because he just asked for life-saving protections. He rightly sues for redress.

---

[4] The Nurse's Oath, known as the Nightingale Pledge, reads: "I solemnly pledge myself before God and in the presence of this assembly to pass my life in purity and to practise my profession faithfully. I will abstain from whatever is deleterious and mischievous and will not take or knowingly administer any harmful drug." Yezzo had acted impurely, put plaintiff in harm's way and sauntered him out of a job by not giving him basic workplace protections.

COUNT ONE
FAILURE TO ACCOMMODATE
REHABILITATION ACT & AMERICANS WITH DISABILITIES ACT

102.    Plaintiff repeats realleges and incorporates by reference every allegation previously made above. Insofar as the elements of the ADA and the Rehabilitation Act are similar, he will recite them simultaneously.

103.    Defendants receive many forms of federal financial assistance and are "employers" under the Rehabilitation and Americans with Disabilities Acts.

104.    Plaintiff filed a charge within 300 days of his termination and got a right to sue within the previous week.

105.    Plaintiff is a covered employee under the ADA and Rehabilitation Act because (a) he had a record of a disability. He recovered from COVID-19, a condition that can kill, but that substantially limits one or more major life activities, such as breathing, taste, and smell; (b) defendants perceived him to have a continued disability despite having emerged from quarantine under CDC guidelines.

106.    Plaintiff also told his supervisor that he had a chronic kidney condition that substantially limits his ability to eat certain foods and, more importantly, filter nutrients from the bloodstream and eliminate waste.

107.    Defendant refused to accommodate Plaintiff by

(a) Refusing to give him a proper respirator;

(b) Refusing to change his assignment to one of the other units, where jobs were available.

108.    As a result, Plaintiff has and will continue to suffer monetary damages, severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses determined at trial.

COUNT TWO
REHABILITATION ACT/AMERICANS WITH DISABILITIES ACT
ANIMUS BASED ON ACTUAL OR PERCEIVED DISABILITY

109.    Plaintiff repeats realleges and incorporates by reference every allegation previously made above.

110.    Defendant perceived Plaintiff as contagious in refusing to assign him to one of the "clean" units and as a higher risk to the Hospital given his kidney disease.

111.    If the Defendant wanted Plaintiff to return, it would have found a PAPR or assigned him to a "clean" unit

112.    It failed to do so purely out of stigma and fear, grounded in discrimination based on disability.

113.    As a result of the preceding, Plaintiff has been damaged.

COUNT FOUR
DISABILITY DISCRIMINATION UNDER THE STATE HUMAN RIGHTS LAW
FAILURE TO ACCOMMODATE

114.    Plaintiff repeats and realleges all previous paragraphs as if set forth herein.

115.    As a result of the preceding, Plaintiff has been damaged.

COUNT FIVE
RETALIATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW
ANIMUS BASED ON ACTUAL OR PERCEIVED DISABILITY

116.    Plaintiff repeats and realleges all previous paragraphs as if set forth herein.

117.    As a result of the preceding, Plaintiff has been damaged.

COUNT SIX
VIOLATION OF NEW YORK LABOR LAW § 741

118.    Plaintiff repeats and realleges all previous paragraphs.

119.    Defendant took retaliatory action against Plaintiff because he (a) disclosed to a supervisor a policy or practice of the employer that Plaintiff, in good faith, believed constituted improper quality of patient care; and (b) objected or refused to participate in such activity.

120.    Plaintiff brought the inadequate quality of patient care to the attention of a supervisor and afforded the employer a reasonable opportunity to correct such activity, policy, or practice.

121.    As a result of the preceding, Plaintiff was constructively discharged.

122.    Plaintiff has been damaged and is entitled to reasonable attorneys' fees.

COUNT SEVEN
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

123.    Plaintiff repeats and realleges all previous paragraphs as if set forth herein.

124.    Defendant Samaritan and Bon Secours' conduct was 'so outrageous in character, and so extreme, as to go beyond all possible bounds of decency. It was utterly intolerable in a civilized community.

125.    Defendants sent Plaintiff into a whirlwind of panic and fear. Being in his early twenties, with Chronic Kidney Disease, living with elderly parents with multiple chronic conditions, he feared the absolute worst for everyone.

126.    He has yet to be diagnosed but is seeking medical care.

127.    He was emotionally stable before this, so the causation is plain.

128.    The intentional actions of the Hospital include but are not limited to:

(a) failing to recognize the apparent COVID symptoms of the patient who died;

(b) failing to procure a PAPR;

(c) lying to Plaintiff about its inability to obtain a PAPR (or that those in the

Hospital that needed cartridges);

(c) accusing him of "playing games" when he simply asked for proper PPE.

129.    As a result of the preceding, Plaintiff has been damaged.

COUNT EIGHT
FRAUD or OTHER INTENTIONAL TORT CAUSING MENTAL AND PHYSICAL
PAIN AND SUFFERING

130.    Plaintiff repeats and realleges all previous paragraphs as if set forth herein.

131.    Defendants acted in bad faith or lying, and Plaintiff, relying on the misrepresentation (or

material omission), was harmed by the bad faith and lie.

132.    The misrepresentation of material fact was that the disabled patient should not be tested for

COVID and not treated as any other COVID-positive patient. Indeed, any competent doctor would

know that the patient had COVID, and the Hospital likely discriminated against him because of

his special needs and the fact that he did not have a family to advocate for him – nor could he for

himself.

133.    The assertion that the patient either did not have COVID or should not test for COVID was

a lie that not only hastened the patient's painful death but put Plaintiff in the position of not having

proper health protections.

134.    The patient was merely left to die in pain and alone. The only person blowing the whistle

to advocate for him was Plaintiff, just to be rebuffed by the nurses who were his superiors.

135.    Plaintiff was skeptical of the information but relied on it – how could he know that the

defendants would be so evil?

136.    Plaintiff suffered injury from this reliance – pain and suffering, both mental and physical.

137.    Defendants sent Plaintiff into a whirlwind of panic and fear. Being in his early twenties,

with Chronic Kidney Disease, living with elderly parents with multiple chronic conditions, he feared the absolute worst for everyone.

138.    He has yet to be diagnosed but is seeking medical care.

139.    He was emotionally stable before this, so the causation is plain.

140.    The intentional actions of the Hospital include but are not limited to:

141.    As a result of the preceding, Plaintiff has been damaged.[5]

WHEREFORE, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I.    Compensatory damages in an amount no less than $1,000,000 to Plaintiff whole for any earnings, including bonus payments, he would have received but for Defendants' discriminatory treatment and constructive termination, including but not limited to, back pay, front pay, and

---

[5] While New York law usually relegates claims for injuries in the workplace to Worker's Compensation, an intentional injury by the employer – or its employee – is an exception to the NY Worker's Compensation Law bar.  Where an injury is sustained to an employee due to an intentional tort perpetrated by the employer or at the employer's direction, the Workmen's Compensation Law is not a bar to a common-law action for damages. *See Jones v. State*, 96 A.D.2d 105 (4th Dept. 1983) (citing *Lavin v. Goldberg Bldg. Material Corp.,* 274 App. Div. 690 (3rd Dept. 1949) (worker died from assault by fellow worker). As the Appellate Division recited the "general rule" in *Jones,* "an employee injured in the course of employment is relegated to workers' compensation as his exclusive remedy  . . . [Except if] injury results from "an intentional tort perpetrated by the employer or at the employer's direction, the [Workers'] Compensation Law is not a bar to a common-law action for damages. To recover for his injuries under the intentional tort exception, the employee must establish that the employer  . . . that the acts of the employer constituting [an intentional tort] were deliberate and not merely reckless, and the employee's burden of proof on these issues has been characterized as "heavy." *Id.,* 96 A.D.2d at 106. Plaintiff accepts that the burden might be heavy, but the facts demonstrate that evil acts in derogation of the patient and plaintiff were spun into action by defendants and deserve discovery on this cause of action.

pension benefits;

II.      Compensatory damages bestowing upon plaintiff money damages for mental anguish, loss

of dignity, humiliation, and injury to livelihood in an amount that is fair, just, and reasonable, to

be determined at trial.

III.     Attorneys' fees under the Rehabilitation Act and such other statutes that allow it;

IV.     Punitive damages to be determined by the trier of fact;

V.      Prejudgment interest and costs; and

VI.     Such other and further relief that the Court may deem just and proper.

Dated: New York, New York
        September 21, 2020


_____*Greg S. Antollino*_____
GREGORY ANTOLLINO, ESQ.
275 SEVENTH AVENUE, SEVENTH FLOOR
NEW YORK, NEW YORK 10001
(212) 334-7397

gregory@antollino.com