USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: 
DATE FILED: 9/28/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NICHOLAS EARL,

Plaintiff,

-against-

GOOD SAMARITAN HOSPITAL OF SUFFERN, BON SECOURS CHARITY HEALTH SYSTEM, and WESTCHESTER COUNTY HEALTH CARE CORPORATION d/b/a WMCHEALTH,

Defendants.

20 CV 3119 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff Nicholas Earl ("Plaintiff"), a nurse, brings this action against Good Samaritan Hospital of Suffern (the "Hospital"), Bon Secours Charity Health System ("Bon Secours"), and Westchester County Health Care Corporation d/b/a WMCHealth[1] ("WMC" and, together with the Hospital and Bon Secours, "Defendants") alleging that in March 2020, at the beginning of the COVID-19 pandemic, while he was working for the Hospital as a critical care nurse, Defendants denied him access to necessary protective equipment—a Powered Air Purifying Respirator

[1] Defendants aver that Plaintiff mistakenly sued Westchester Health Care Foundation, Inc. and Westchester Health Care Network, which are not actual entities. Instead, there is a Westchester Medical Center Foundation, which is the not-for-profit, development, and fundraising arm that supports Westchester Medical Center's healthcare mission and an entity called Westchester County Health Care Corporation ("WCHCC"), which is a public benefit corporation established under the laws of the state of New York, which does business as Westchester Medical Center, Westchester Medical Center Health Network, and WMCHealth ("WMC"). For purposes of their motion, Defendants assumed that Plaintiff intended to sue WMC. (Mem. at 1 n1.) Plaintiff appears to concede in his opposition that this is the case. (Opp'n Mem. at 10.) Accordingly, the Court will refer to WMC and directs the Clerk of Court to replace on the docket "Westchester Health Care Foundation d/b/a Westchester Health Care Network" with "Westchester County Health Care Corporation d/b/a WMCHealth."

(PAPR)—and assigned him to a special needs patient who spread COVID-19 to him. He further avers that after he was out with COVID-19 for nearly a month, the Hospital refused to accommodate him upon his return either by providing him a PAPR or transferring him to a non-COVID-19 or "clean" unit and, therefore, constructively discharged him. Plaintiff asserts claims sounding in failure to accommodate and discrimination in violation of the Rehabilitation Act and Americans With Disabilities Act ("ADA"), discrimination and retaliation in violation of the New York State Human Rights Law ("NYSHRL"), violation of New York Labor Law Section 741, intentional infliction of emotional distress, and fraud or other intentional tort. Defendants' motion to dismiss, which Plaintiff opposed, is now before the Court. For the reasons that follow, the Court GRANTS Defendants' motion and dismisses Plaintiff's claims without prejudice.

## BACKGROUND

The facts herein are drawn from the Amended Complaint ("AC" (ECF No. 20)),[2] presumed to be true for the purposes of this motion and construed in the light most favorable to the Plaintiff. *See Caro v. Weintraub*, 618 F.3d 94, 97 (2d Cir. 2010).

### I. Factual Allegations

Plaintiff has had chronic kidney disease since he was an infant. (AC ¶47.) Plaintiff graduated from nursing school in 2018 and was hired to work as a nurse in the surgical intensive care unit at the Hospital beginning in October 2018. (AC ¶ 22.) Plaintiff alleges that the Hospital is "governed by co-employers Bon Secours and Westchester Health Care Network." (AC ¶ 1.) He further avers that the Hospital is "controlled and funded by Bon Secours and Westchester Health." (AC ¶ 8, 14, 16-17.)

[2] The Court has not considered the many articles and additional factual allegations contained in Plaintiff's memorandum in opposition as these materials were not within, appended to, or integral to the Amended Complaint.

In October 2019, Plaintiff underwent a "fit test" to ensure that he was outfitted with a mask with a proper seal. (AC ¶¶ 27, 30.) Plaintiff alleges that his original fit test indicated that he needed a PAPR (AC ¶ 28), and the Hospital "registered on his card . . . that he *would* fit for a PAPR" (AC ¶ 31). Though Plaintiff repeatedly asked for a PAPR, he was never provided with one. (AC ¶ 31.) Plaintiff alleges that a PAPR usually costs about $300 and, to properly function, requires a $125 cartridge, which lasts about five years. (AC ¶ 30.) Plaintiff acknowledges that at the time of the incidents alleged, PAPRs could be purchased for $1,700 on Amazon.com. (AC ¶ 30; *see* AC ¶ 91 (acknowledging that at the time of the incidents alleged, the PAPR and cartridge together would have cost Defendants about $1,800).)

On an unspecified date in or around March 2020, at the beginning of the COVID-19 pandemic, Plaintiff was assigned to care for a gravely ill special-needs patient (the "Patient") the night before he died. (AC ¶ 36.) Plaintiff alleges that he was assigned to this patient because he is male, and Plaintiff was one of the few male nurses at the Hospital. (AC ¶ 12 and 4 n.3.) The Patient had pneumonia and had earlier been in a negative-pressure room (AC ¶ 37) but at some point the doctor told Plaintiff that pneumonia needed to be on both sides of the lungs to justify a COVID test and therefore the Patient did not need a COVID test or to be treated as COVID-positive. (AC ¶¶ 39-40.) Plaintiff alleges that the failure to test the patient for COVID-19 or treat him as COIVD-19 positive was significant because at the time, all N95 masks were being kept by the supervisors or designated only for use with suspected COVID-19 patients. (AC ¶ 52.) Additionally, the Patient was removed from the negative-pressure room and was not fitted with a non-rebreather mask, which was not allowing him to absorb enough oxygen. (AC ¶¶42-43.)

Plaintiff alleges that when he cared for him, the Patient was showing "classic symptoms of COVID" including a fever of 103 degrees, low oxygen saturation, profusely sweating, and brain

stat. (AC ¶¶ 36, 41, 42.) He alleges that another nurse assigned to the Patient also believed the Patient had COVID. (AC ¶ 51.)

Plaintiff reported to the day nurse and his night supervisor that the Patient did not have any protections and that Plaintiff could not get a satisfactory mask for his own protection. (AC ¶44.) One of the nurses responded, "I've lived through three of these end-of-the-world pandemics, and we'll be ok." (AC ¶45.) Plaintiff then texted his direct manager, Megan Hanys and told her that he lives with parents who have risk factors for COVID—hypertensive, diabetic, and obese—and that Plaintiff has chronic kidney disease and that reports from China indicate that COVID-19 can shut the kidneys down. (AC ¶¶46-47.) Hanys told Plaintiff to "calm down." (AC ¶ 48.) Plaintiff went above Hanys and told the charge nurse that he and the Patient needed better care. (AC ¶ 49.) Plaintiff spoke to the evening supervisor, Marie Van DeVere about how uncomfortable he was caring for the Patient with his "air passages fully exposed." (AC ¶ 52.) Plaintiff searched for supplies to protect himself and was able to find one surgical mask, which was inadequate because part of Plaintiff's duties including suctioning "virus-laden gunk out of the disabled patient's windpipe." (AC ¶ 50.) Plaintiff left after his evening shift. (AC ¶ 53.)

When Plaintiff returned to work two or three days later, he learned that the patient had died. (AC ¶ 53.) The Patient's family insisted on a post-mortem COVID test, which came back positive. (AC 54.) Plaintiff was tested and began feeling COVID-19 symptoms during the five days it took to receive his positive test result. (AC ¶ 54.) Plaintiff's primary care doctor told him that given his kidney disease and the COVID-19 infection, "he should not be in contact with immunocompromised people." (AC ¶ 57.) Plaintiff's occupational health nurse at the Hospital said that he could not care for critical patients without a proper mask. (AC ¶ 82.) Because of Centers for Disease Control guidelines and the fact that he still felt poorly for nearly a week after he tested

negative for COVID-19, Plaintiff was out of work for approximately three weeks. (AC ¶¶ 58-59.) Plaintiff alleges that while he was out with COVID-19, he spoke to his regular manger about his need for a PAPR and the manager said, "just get fit tested again." (AC ¶ 72.) Plaintiff responded that he could not accurately be fit-tested now since the test measures taste and smell, which he had lost due to COVID-19. (AC ¶ 72.)

Plaintiff admits that at the time of the incidents alleged, after a 14-day quarantine, someone who has been released from quarantine was not considered a risk for spreading COVID-19. (AC ¶ 83.) Nonetheless, Plaintiff points to an early case of a Hong Kong man being diagnosed with COVID-19 a second time and while he acknowledges that "epidemiologists were quick to report that this reinfection was not a cause for panic" (AC ¶ 84), he asserts that he feared reinfection (AC ¶ 78).

Upon his return to work, Plaintiff reported to the fit-testing station where he told the tester that it was his first night back after having COVID-19. (AC ¶ 60.) Plaintiff alleges that he failed the fit test with both available masks as he still tasted the solution during the test. (AC ¶ 60.) He worked for two nights with an N95 respirator. (AC ¶ 61.) On the first night, "the mask would just come off his face." (AC ¶ 61.) The next day, he went back to the fit-testing station but they had no new masks. (AC ¶ 62.) When he raised the issue with his supervisor, Nurse Adrianne said "didn't you get fit tested yesterday," to which Plaintiff responded that he had but the mask was too small, to which Nurse Adrianne responded "You passed yesterday. What games are you playing." (AC ¶ 65.) When Nurse Adrienne asked what Plaintiff wanted, he said "All I want is a mask that fits." (AC ¶¶ 68-69.) An occupational health nurse said, "He needs a PAPR," to which Nurse Adrienne said "We don't have any. We need to find something else that will work." (AC ¶¶ 71-72.) There was no search for a suitable mask. (AC ¶ 72.) The occupational health nurse then said to Nurse

Adrienne "Can't he go to a clean unit?"—referring to a newly opened unit for non-COVID patients—to which Nurse Adrienne responded, "He's a critical care nurse." (AC ¶¶ 74-76). Plaintiff alleges that based on his experience and education there were other jobs of lesser risk—such as in a "clean unit"—for which Plaintiff was qualified. (AC ¶ 77.)

Plaintiff submitted his resignation, providing two-weeks' notice, suggesting that he would be willing to work in a non-COVID unit or, with a PAPR, in the critical care unit. (AC ¶¶ 79-80.) Plaintiff received a call from Phyllis M. Yezzo, the Chief Nursing Officer, who indicated that she wanted Plaintiff to return to the Hospital but that the Hospital could not give him a PAPR because they did not have the requisite $125 cartridges. (AC ¶ 94.) The next day, Plaintiff responded by email indicating that he would not return to the Hospital unless he received a PAPR or was placed in a clean unit. (AC ¶ 96.) Nurse Yezzo responded "Thank you for getting back to me. I was hoping you would reconsider returning to [the Hospital]. I am disappointed you have not reconsidered. Please know we are open to exploring your return in future should you change your mind." (AC ¶ 98.)

## II. Procedural History

Plaintiff filed this action on April 18, 2020. (ECF No. 1.) Plaintiff filed an Amended Complaint on September 21, 2020. (ECF No. 20.) Defendants moved to dismiss (ECF No. 27; *see* ECF Nos. 28, 30), which Plaintiff opposed (ECF No. 29).

## LEGAL STANDARD

To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). Factual allegations must "nudge [a plaintiff's] claim from conceivable to plausible." *Twombly*, 550 U.S.

at 570. A claim is plausible when the plaintiff pleads facts which allow the court to draw a reasonable inference the defendant is liable for the unlawful activity alleged. *Iqbal*, 556 U.S. at 678. "In considering a motion to dismiss for failure to state a claim, the district court is normally required to look only to the allegations on the face of the complaint . . . . the court may [also] consider documents that are attached to the complaint, incorporated in it by reference, [or] integral to the complaint." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quotation marks omitted).

In assessing the sufficiency of the claims, the court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013). While legal conclusions may provide the "framework of a complaint," "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678-79. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* at 678.

**DISCUSSION**

Plaintiff asserts claims sounding in failure to accommodate and discrimination in violation of the Rehabilitation Act and Americans With Disabilities Act ("ADA"), discrimination and retaliation in violation of the New York State Human Rights Law ("NYSHRL"), violation of New York Labor Law Section 741, intentional infliction of emotional distress, and fraud or other intentional tort.[3,4]

---

[3] Plaintiff alleges in passing that he was assigned to the Patient and therefore unjustly exposed to COVID-19 because he was male. The Amended Complaint does not include causes of action for age or gender discrimination. Accordingly, the Court need not consider these theories at this juncture.

[4] Insofar as Plaintiff suggests that Defendants failed to comply with federal workplace standards, that claim is not properly before the Court. *See, e.g.*, *Palmer v. Amazon.com, Inc.*, 498 F. Supp. 3d 359, 368-69 (E.D.N.Y. 2020) (declining to consider warehouse worker claims that

## I. ADA and Rehabilitation Act Claims

Plaintiff alleges that Defendants failed to accommodate him and discriminated against him for an actual or perceived disability in violation of the Rehabilitation Act and the ADA. Defendants aver, *inter alia*, that Plaintiff has failed to state a disability or handicap as defined by these federal statutes.. As explained below, the Court agrees that Plaintiff has failed to plead a cognizable disability or handicap under either the ADA or Rehabilitation Act.

### A. Legal Framework

The ADA prohibits an employer from discriminating against an employee "because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). As defined by the ADA, "discrimination" includes, *inter alia*,

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless . . . [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the . . . [employer's] business.

Id. § 12112(b)(5)(A) (emphasis added). "[O]therwise qualified" means that the individual, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8).

The Rehabilitation Act, which prohibits disability-based discrimination by government agencies and other recipients of federal funds, is similar. Section 504(a) of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal

employer failed to follow federal workplace safety requirements during COVID-19 pandemic under doctrine of primary jurisdiction).

financial assistance . . . .

29 U.S.C. § 794(a).

Therefore, to plead a *prima facie* violation under the ADA or Rehabilitation act, a Plaintiff must allege "(1) that [he] is a 'qualified individual' with a disability; (2) that the defendants are subject to one of the Acts; and (3) that [he] was 'denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or [was] otherwise discriminated against by defendants, by reason of [his] disabilit[y].'" *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 85 (2d Cir. 2004), *opinion corrected*, 511 F.3d 238 (2d Cir. 2004) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)) (all but first alterations in original).

**B. <u>Application</u>**

As a threshold matter, the Court must determine whether Plaintiff has plausibly alleged that he has an impairment that substantially limits one or more major life activities. Plaintiff appears to advance three grounds for finding him "disabled" or "handicapped": (1) Plaintiff recovered from COVID-19, which has substantially limited his taste and smell; (2) the Hospital perceived him as infectious and therefore disabled because had COVID-19; and (3) he was disabled because of his chronic kidney disease, which put him at elevated risk of complications from further exposure to COVID-19. As explained below, Plaintiff has not plausibly alleged that he is "disabled" or "handicapped" under any of these theories.

The ADA contains a non-exhaustive list of "major life activities," which includes "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2). "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." 42 U.S.C. § 12102(4)(E).

Regulations promulgated under the Rehabilitation Act by the Department of Health and Human Services define a "a handicapped person" as "any person who (i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment," 45 C.F.R. § 84.3(j)(1), and a "qualified handicapped person" as one who "with reasonable accommodation, can perform the essential functions of the job in question." 45 C.F.R. § 84.3(l)(1).

As to the first basis, Plaintiff fails to allege that any limitation on his taste or smell caused by COVID-19 is more than temporary. *See, e.g.*, *Dudley v. N.Y.C. Housing Auth.,* No. 12 Civ. 2771(PGG), 2014 WL 5003799, at *34 (S.D.N.Y. Sept.30, 2014) ("temporary disabilities do not trigger the protections of the ADA because individuals with temporary injuries are not disabled persons within the meaning of the act"). In fact, Plaintiff's allegations suggest that while he was out with COVID-19 he may have lost his senses of taste and smell but that when he fit tested upon his return, he tasted the solution during the test. (AC ¶ 60.) Further, while "eating is a major life activity," *Price v. Mount Sinai Hosp.*, 458 F. App'x 49, 51 (2d Cir. 2012), Plaintiff has not plausibly alleged that as a result of contracting COVID-19 he has suffered any loss of taste that "significantly limits" his ability to eat nor has he plausibly alleged that the ability to smell constitutes or impacts a major life activity.

As to the second basis, perception of infectiousness is not the same as perceived disability and, in any event, Plaintiff's claim that the Hospital considered him infectious is wholly speculative. Moreover, Plaintiff acknowledges that at the time of the alleged incidents medical experts believed that an individual released from quarantine is not considered a risk for spreading and that reinfection was unlikely. (AC ¶¶ 83, 84.) Plaintiff has failed to plausibly allege that the

Hospital perceived him to be disabled based on his potential to infect patients with COVID-19 after he recovered.

As to the third basis, Plaintiff fails to allege that his chronic kidney disease alone or in combination with COVID-19 substantially limits a major life activity. Plaintiff alleges that he has had chronic kidney disease since he was an infant (AC ¶47) and nowhere suggests that, prior to contracting COVID-19, his chronic kidney disease substantially limited a major life activity. *See, e.g.*, *Irby v. N.Y. City Transit Auth.*, No. 99 CIV. 2172(VM), 2000 WL 1634413, at *2 (S.D.N.Y. Oct. 30, 2000) (finding plaintiff who alleged that symptoms of polycystic kidney and polycystic liver disease caused her to miss work at least two to three days each month was not substantially limited in any major life activity), *aff'd*, 262 F.3d 412 (2d Cir. 2001); *cf. Abrams v. Reade*, 419 F. Supp. 2d 476, 483 (S.D.N.Y. 2005) ("Scioscia does not suggest that his kidney stones substantially limited any major life activity. While Duane Reade was aware of Scioscia's kidney stones, Scioscia has not introduced any evidence that his kidney stones were perceived by his employer to limit any major life activity). Insofar as Plaintiff may be alleging that his chronic kidney disease was exacerbated by COVID-19, he has failed to plausibly allege how, post-COVID-19 it constitutes a disability or handicap. *See, e.g.*, *Langella v. Mahopac Cent. Sch. Dist.*, No. 18-CV-10023 (NSR), 2020 WL 2836760, at *10 (S.D.N.Y. May 31, 2020) (dismissing ADA claim where plaintiff did "not allege how, if at all, his hypertension or heart disease impacts a major life activity, let alone that either significantly restricts it"). If, instead, Plaintiff is alleging that because he has chronic kidney disease, as he did before he contracted COVID-19, because the kidneys are vulnerable to COVID-19 he could have severe consequences if he were to contract COVID-19 again, Plaintiff has nonetheless failed to plausibly allege substantial impairment of a major life activity because of his kidney disease because "it is the nature of the ordinary limitations—not the

severity of the consequences if a plaintiff fails to follow necessary treatment—that determines whether a limitation on a major life activity is substantial." *Krikelis v. Vassar Coll.*, 581 F. Supp. 2d 476, 485 (S.D.N.Y. 2008) (holding that plaintiff failed to allege that restrictions on eating caused by her diabetes significantly limited her ability to eat).

In sum, Plaintiff has failed to plausibly allege that he has an impairment that substantially impairs one or more major life activity and therefore has failed to plausibly allege that he is disabled or handicapped within the relevant federal statutes. To the extent Plaintiff chooses to file a Second Amended Complaint consistent with this opinion, Plaintiff is directed to clarify whether he is solely claiming failure to accommodate or also claiming that Defendants took some other discriminatory action against him.

## II. State Law Claims

Because the Court grants Defendants' motion as to the federal claims, the Court declines to extend supplemental jurisdiction over the state law claims under the NYSHRL and New York Labor Law and for intentional infliction of emotional distress, and fraud or other intentional tort, and dismisses these claims without prejudice. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . ."); *see also Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims").

## CONCLUSION

The Court GRANTS Defendants' motion to dismiss and dismisses Plaintiff's claims without prejudice. Plaintiff may file a Second Amended Complaint on or before October 20, 2021. If Plaintiff files a second amended complaint, Defendants shall answer the second amended complaint or seek leave to file a non-duplicative motion on or before November 10, 2021.

The Clerk of Court is directed to correct the Docket to reflect the proper names of the entities sued. "Westchester Health Care Foundation d/b/a Westchester Health Care Network" shall be corrected to "Westchester County Health Care Corporation d/b/a WMCHealth." The Clerk of Court is further directed to terminate the motion at ECF No. 27.

Dated: September 28, 2021
White Plains, NY

SO ORDERED.

NELSON S. ROMÁN
United States District Judge