UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK
--------------------------------------------------------X

NICHOLAS EARL,

       Plaintiff,


      -v-

GOOD SAMARITAN HOSPITAL
OF SUFFERN NY, BON SECOURS CHARITY
HEALTH SYSTEM and WESTCHESTER
HEALTH CARE FOUNDATION, INC. dba
WESTCHESTER HEALTH CARE NETWORK, INC.

       Defendants.
--------------------------------------------------------X

      SECOND
      AMENDED
      COMPLAINT


      20-cv-03119-NSR


      JURY   TRIAL
      DEMANDED

## MAJOR LIFE ACTIVITIES[1]

Plaintiff amends the complaint again to allege actionable Plaintiff's major life activities that are impaired either with or without an accommodation that existed before or after he was Exposed to COVID:

---

[1] Plaintiff shall continue to assert that Perception of Disability and Temporary Disabilities are Disabilities (or may be disabilities, for the purposes of pleading) within the meaning of the Rehabilitation Act or Americans with Disabilities Act. See *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 107 S. Ct. 1123 (1987) (perception) and *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 95 (2d Cir. 2021) (temporary). Insofar as the Court has ruled otherwise in this case, Plaintiff asks that the Court reconsider and take judicial notice of the aforementioned cases: especially the latter, which is more recent, and, with all due respect, reversed a decision by this Court.

1. <u>Smell and Taste Each Individually Are Each Major Life Activities Act as One</u>

   a. Plaintiff's loss of sense of smell (and taste) not only negatively affects his quality of life but is dangerous to Plaintiff and those around him. Without smell or taste, he doesn't know if something is burning inside the house.

   b. Even though there are expiration dates on food items, there have been multiple occasions that he has ingested rancid meat, milk, and other foods that could cause disease. He often must have a "taster," usually a family member, to inform him that he should not eat spoiled foods. This inability has caused Plaintiff severe gastrointestinal problems and illness.

   c. The loss of sense of smell and taste has taken away joy in Plaintiff's life. He is unable to enjoy food, and he now eats to survive; pleasure has nothing to do with the activity of eating, and he has lost over 20 pounds since he caught COVID. He has a severely diminished appetite.

   d. Food is one of life's great joys and has caused Mr. Earl severe emotional trauma because of their combined loss. His favorite foods and drinks now taste like poison, and soda and chocolate are mere examples. Alcohol, used in moderation, is acceptable in life, especially for a man in his mid-twenties, but Mr. Earl cannot partake.

   e. Mr. Earl, despite attempts at amelioration of his anosmia, will be most like going an entire lifetime with this altered sense of smell and taste that has already

negatively impacted his life the last year and a half. He will be unable to smell the scent of his future children or family. The fragrances Earl used to love (new car smell, cookies baking in the oven, and his favorite cologne) are now part of a distant past that each day becomes harder to remember what it was like. He is starting to forget what those smells and tastes were like and associates them with the new, unpleasant ones.

2. <u>Mental Clarity (i.e., without Anxiety) and Ability to Sleep, both Major Life Activities</u>

   a.   Plaintiff suffers from brain fog because of long COVID; it is horrid since his job as a nurse makes him responsible for human lives. He must mentally focus every day while at work. He finds it arduous to concentrate; his memory loss (long and short term) makes him feel like his brain is turning mush; again, he is only 25 years old. Mr. Earl had always been at the top of his class. Now he worries he will not be able to return to school to further his education – whether in nursing or another field – with the cognitive decline he has experienced since COVID.

   b.   Plaintiff has not been able to get a peaceful night's rest since he got COVID; he has difficulty falling asleep and staying asleep. Not only does he wake up feeling short of breath (often almost choking), but he experiences nightmares that leave his heart racing. Many of these nightmares revolve

around hospital settings or that he was one of the millions of people who died of COVID.

3. <u>Digestion</u>

After catching COVID-19, Mr. Earl's digestive tract has troubled him to no end. He never dealt with heartburn before, but now his doctors have placed him on medications. Even missing one day of the drug creates such intense heartburn that it feels as though he is having symptoms that mimic a heart attack. He is unable to tolerate carbonated liquids and frequently regurgitates his food. He has difficulty swallowing, and often it feels as if food sticks at the end of his throat. He usually runs to the bathroom with an upset stomach, even in less-than-ideal circumstances. None of this was a problem before the defendants afflicted him with COVID-19.

4. <u>Breathing/Lungs</u>

a.     Plaintiff has felt significant shortness of breath and chest tightness after his battle with COVID-19. He finds himself yawning all the time, even after a good night's rest, because of the lack of oxygen. When he takes a deep breath, his lungs feel restricted after a shallow inspiration. He is not able to exercise as He once was before COVID. Any sort of cardiorespiratory exercise eludes him. One able to run five miles a day nonstop; he is lucky to get a half mile before running out of breath

to continue. He had never been a tobacco user, but it feels as though he has been smoking for most of his life.

      b.    His posture has been affected because the difficulty of breathing tends to have him bent as he sits forward as a subconscious reaction to having less air.

5. <u>Pre-Existing Kidney Disease</u>

Plaintiff has been fighting chronic kidney disease since birth. His numbers had been stable for years without any further progression of the disease. One of the most critical factors in analyzing the risk of further deterioration is proteinuria (protein in the urine). He had had protein in the urine since 2017, when a doctor prescribed medications to help stop the damage. After COVID-19, he has had two urine samples come up with protein in them. The physical strain that his body has had to endure during its battle with COVID has accelerated the progression of his kidney disease. The mental stress that this has on him is unexplainable. Living with kidney disease affects him every day; the worry that he will soon need dialysis or a transplant is unbearable to his vision of adulthood that has just begun.

6. Because of Defendants Grossly Negligent and Reckless procedures, Plaintiff was infected with COVID. He now has another job as a nurse but once was a hard worker for Defendant Good Samaritan – a hospital governed by co-employers Bon Secours and Westchester Health Care Network. There he became infected with

5

COVID-19 when he should not have had the most straightforward precautions taken place.

7.   Someone or others at Good Samaritan placed him in the room of a man dying of COVID but purposely not tested for COVID. Had the patient – who died of COVID the next day. If the defendants had tested the patient, Mr. Earl would, per Good Samaritan's procedures, have access to adequate personal protective equipment, including a negative-pressure room, to avoid infection or at least some protection.

8.   Instead, Mr. Earl's overnight stay with the patient caused him to get COVID. The patient, a person with special needs, had not seen his family for enough time to know his condition or that he needed an advocate. But after the man died, his family demanded the hospital test the body for COVID-19. Defendant Good Samaritan[2] notified Plaintiff's patient's positive test.

9.   Mr. Earl also tested positive. Insofar as the untested patient was the only COVID+ person that Plaintiff was exposed to, and since came down with symptoms almost immediately after that, the infection came from the patient.

---

[2] Unless otherwise indicated, "Defendant," without a particular designation of Westchester Health or Bon Secours, shall refer to Good Samaritan, as this was plaintiff's place of employment.

10.Nicholas was out for a quarantine period to recover from the infection, which did not pass easily. He had wrenching flu for more than two weeks and still has Amsonia – a loss of his ability to smell and taste.

11.Because Plaintiff's comorbid health condition, including chronic kidney disease – and the kidneys are particularly vulnerable to COVID – it was unsafe for him to attend to immunocompromised patients going forward, as he informed one of his supervisors. Plaintiff could have tended to other patients, however.

12. For now, one could say Plaintiff "well," but he suffered classic symptoms of the infection, physical and emotional; he is lucky to be young enough to utilize his parent's insurance for his health care. He also remains afflicted with anosmia – the inability to smell or taste. When he eats, it feels to him as if he is eating nothing. There is no telling what long-term effects are in store for him. Still, nothing would be waiting in the store had Good Samaritan successfully snuck the infected patient into the room of normal pressure – and knowingly led Antiplaintiff allowing viral particles to fly free and infect Mr. Earl.

      a. It was a shameful moment for which there can be no medical explanation, but the actor(s) at Good Samaritan lied by omission. There was no reason *not* to test the patient who died except that to do so would

not place the patient in a negative pressure room and otherwise alert nurses to take proper protection.

13. Good Samaritan led Mr. Earl into harm's way. Even after he was better when Mr. Earl expressed that – based on his doctor's opinion –he should not be exposed to immunocompromised patients because his chronic kidney disease could worsen if he were exposed to COVID again. But the Hospital remained stubborn and refused to accommodate him. Not only would it provide him a proper respirator – which it said it had in stock – it also did not reassign him to another job without exposure to COVID patients, and there were many. The Hospital's Occupational Health Nurse even suggested the Hospital should assign him to a non-COVID unit.

14. Long before he returned, he notified Good Samaritan – controlled and funded by Bon Secours and Westchester Health – that he had kidney disease and further exposure to COVID-19 patients could exacerbate it. Weeks later, after he tested negative and returned ready to work, the Hospital did not ask for medical documentation; it just told him he had to work against his doctor's advice. This omission demonstrated the Hospital's nefarious intent.

15. Defendants refused to reassign him to non-COVID patients, even though this would have been simple. They refused to supply him with a respirator that fit his face – he has a prominent jaw – that would protect him from infection. The respirator he needed – at least in proximity to COVID patients – is known as a PAPR – an

atypical but not unusual respirator, whose initials stand for "powered, air-purifying respirator." (Pronounced *PAP*-er.) The Hospital gave him conflicting reasons why he could not have a PAPR – no batteries, no cartridges, but those *accouterments* the Hospital could readily have obtained.

16.     Or, more likely, defendants were lying about the PAPR it supposedly had on site. It didn't want to buy another, despite that OSHA rules required it.

17.     Defendants' actions were inexplicable as anything but motivated by hubris, optics, and greed. It is more than likely that the Hospital chose because it wanted a man in the ICU, where the COVID patients the Hospital sent (mostly) to die. (One younger, celebrated patient was released among cheers recently after five months on the respirator.

18.     It also seems that the defendants wanted a male to attend to the dying special-needs patient. Plaintiff makes this inference because the Hospital flouted its usual procedures in taking him out of turn for the assignment.

**THE PARTIES**

19.     Plaintiff is a resident of Rockland County, New York.

20.     Good Samaritan Hospital of Suffern, N.Y., is a nonprofit corporation organized under the laws of New York with offices in Suffern, New York. It is part of the Westchester Medical Health Center Network (WMC) and the Bon Secours Charity Health System Affiliated Group, a nonprofit health corporation whose

9

principal place is at Good Samaritan in Suffern. WMC owns a 60% share of Good Samaritan, and the other 40%, upon information and belief, is owned by Bon Secours. WMH holds majority control over Bon Secours and supplies funding to Bon Secours and its affiliates. WMH's logo is on Bon Secours's website. Bon Secours, in turn, is the umbrella corporation for Good Samaritan and several other hospitals in the northeast.

21.     Bon Secours' Mission "is to make visible God's love and to be a good help to those in need, especially those who are poor, vulnerable, and dying. As a system of caregivers, we commit ourselves to help bring people and communities to health and wholeness as part of the healing ministry of Jesus Christ and the Catholic Church."

22.     Bon Secours revenues are only slightly higher than its expenses, but it has an endowment exceeding $51,000,000, according to the latest IRS Form 990, and $6,459,000 of other investments. (Good Samaritan, part of Bon Secours, has not filed a tax return since Bon Secours acquired it.)

23.     Westchester Medical Health Foundation, Inc. (WMH) does business as the "Westchester County Health Care Corporation" – or one could say vice versa. The latter corporation has registered with New York and has offices in Valhalla, New York. The former perhaps calls itself a "corporation" – in the general sense, perhaps; unusually, there is no such name registered with the New York Secretary of State. Nevertheless, as of 2020, it had an endowment of $24,358,374, according to its latest

990. These numbers will be relevant if the defendants contend it was an undue burden to accommodate Plaintiffs receive federal financial assistance, including but not limited to Medicaid and Medicare.

**JURISDICTION AND VENUE**

24.   Jurisdiction is proper in this district under 28 USC § 1331. This action arises under the Constitution and laws of the United States, including the Rehabilitation Act – which requires no conditions precedent – and the Americans with Disabilities Act, for which Plaintiff's week received a right-to-sue letter. State claims are pendant and arise under the same common nucleus of operative fact.

25.   Venue is proper, at a minimum, in this district under 28 USC § 1391(c)(2) as Defendants reside in this judicial district.

FACTUAL ALLEGATIONS

26.   Plaintiff repeats and realleges the previous allegations as if fully set forth herein.

27.   Plaintiff is graduated in 2018 with a Degree in Nursing. He started employment as a nurse at Samaritan and worked in the surgical intensive-care unit in October 2018. His Nursing Manager was Megan Hayes. Ranking above Hayes was Chief Nursing Officer Phyllis Yezzo.

28.   While Plaintiff was working at Bon Secours – from his start date until his departure when Samaritan and Bon Secours constructively discharged him by

refusing to accommodate him – he had no problems at Samaritan. He received unbidden compliment cards from five or six patients and had at least one early evaluation, and it was uniformly positive.

29.     Early in March, Plaintiff heard on television that someone famous had died – his first information about COVID. No one at the Hospital spoke of the possible pandemic, even though there was sufficient information (for the Hospital) to make preparations. As March progressed, there were, upon information and belief, ten cases at Samaritan. A year later, who knows?

30.     When COVID patients arrived, Samaritan did the medically proper thing and put suspected patients in negative-pressure rooms. There, the controlled atmosphere avoided the shed of the virus. The staff intubated some patients to put them on a ventilator, and when doing this, the nurses wore the proper N95 masks, medically appropriate under OSHA guidelines.

31.     Plaintiff's only training was a PowerPoint presentation about the respirators and the pressure rooms. It seemed rushed, but he adapted.

32.     Per Samaritan's procedures – as required by OSHA – Plaintiff underwent a "fit test." This test is intricate: the testers place various masks on the testee's (i.e., the nurse's) face. The nurse then smells items offered by the tester. The test's purpose is to ensure nothing airborne seeps through into the mouth and lungs;

otherwise, there is no proof of a proper seal to avoid the spread of viruses, bacteria, or other pathogens through any cracks or gaps in the mask.

33.    Plaintiff's FIT test initially indicated his need for a PAPR; the Hospital duly noted and ignored the result. When he returned to work, he tried to FIT test twice with an N95 mask, but he could still smell and taste, so the typical N95 did not operate to avoid spreading the virus.

34.    He repeatedly asked for the PAPR.

35.    He got no PAPR. Given that he fit tested for a PAPR in October 2019, the Hospital, per OSHA regulations, was supposed to give him one. Assuming the Hospital was not lying when it said it had a PAPR or two on-site but had no batteries or cartridges, it could have purchased one. At the time, the PAPR cost about $1,700, available on Amazon.com. Usually, its value is $300, and the Hospital could have purchased it when Plaintiff tested for the PAPR. Cartridges are required, and they last about five years at about $125 a pop.

36.    Defendants did not give Plaintiff a PAPR. Instead, the hospital tester estimated his face for the much cheaper N95, which he nevertheless never got. However, Samaritan registered his on a card, saying that he *would* fit for a PAPR, even if one would not supply it. The Hospital holds onto the certificate to show compliance with OSHA guidelines, but the card means nothing: Samaritan never gave Plaintiff the PAPR he tested for as appropriate for him.

37.    Samaritan and Secours pay lip service to its mission "to make visible God's love and to be a good help to those in need." The Westchester Network has no religious mission, but it pays lip service a commitment to PPE. At the height of the pandemic in New York, C.E.O., Michael D. Israel wrote, on behalf of his Network on the Samaritan website:

> WMCHealth has adequate PPE, ventilators, medical equipment[.].WMCHealth has proper PPE on hand. . . . Our care teams have been highly conscious about the appropriate use and conservation of PPE and are working under current CDC guidelines for PPE use.

*See* https://www.goodsamhosp.org/news/message-from-president-and-ceo-michael-d-israel-1414 (this specific message was posted on April 17, 2020.

38. The truth is, however, that insofar as Samaritan would not provide Plaintiff a PAPR – it was not true that "WMCHealth ha[d] proper PPE on hand." Nor was it true that the Hospital's "care teams have been extremely conscious about the appropriate use and conservation of PPE." Notably, though subject to OSHA regulations, the Hospital invoked the continually watered down and fluffed up Center for Disease Control "guidelines," which are often political statements. Still, even accepting the CDC guidelines as to proper and sufficient, the Hospital failed.

39.    On March 9, 2020, with only 500 COVID-19 infections in the United States, the CDC published guidelines for workers whose recommendations for the social distancing of at least 6 feet and Personal Protective Equipment ("PPE") for workers.

40.    The same day, March 9, 2020, OSHA released its guidelines, recommending that companies should offer surgical masks or respirators to workers who were at risk of infection with COVID-19, especially those that worked in close quarters:



**Personal Protective Equipment (PPE)**

Employers are obligated to provide their workers with PPE needed to keep them safe while performing their jobs. The types of PPE required during a COVID-19 outbreak will be based on the risk of being infected with SARS-CoV-2 while working and job tasks that may lead to exposure.

(Screenshot from OSHA guidelines, March 9, 2020.)

41.    The special-needs patient was the only one that Plaintiff all night on the patient's last night, and he had classic symptoms of COVID.

42.    First, the patient had pneumonia and was placed in a negative-pressure room, then put on precautions for COVID-19.

43.    Suddenly, the Hospital did not see the utility of testing a special-needs patient, 59 years of age, and his family could not object or advocate for them as they couldn't even visit him. 39. The doctor told Plaintiff that if one were to have pneumonia, it must be on both sides of the lungs to justify using a COVID test.

44.    This potential diagnosis for testing was purely pretextual.

45.    The doctor seemed unusually concerned that COVID is a multi-organ disease with numerous symptoms, no matter the lung criteria. The Hospital did not test the patient because it was almost sure he was COVID positive. The Hospital wanted to

avoid exposing this knowledge: The patient would die absent extraordinary measures; he was 59 and had special needs.

46.     Any competent doctor would have known that a patient with a fever of 103, sweating profusely (diaphoretic) and brain stat – meaning he was almost brain dead. But he was just left there with Plaintiff.

47.     The patient's oxygen saturation was in the mid-8mid-'80; the Hospital did not fit the patient with a non-rebreather mask – a device that allows the flow of oxygen rather than the mere feed of oxygen. In other words, he wasn't even given oxygen except for optic and perhaps palliative purposes – the air went into his throat, but he wasn't absorbing it. His blood oxygen level measured how much $O^2$ the red blood cells were carrying to the brain. To have a ratio of oxygen within the '80s is not like getting a "B" as in school – it is undoubtedly an "F." A healthy percentage is 95-100%.

48.     Though the patient was on supplemental – again, purely fed, not recycled – oxygen, Mr. Earl put a different mask on his face; he was still not getting enough oxygen, meaning that the patient needed a rebreather mask. Still, the Hospital refused to provide by quietly ignoring his symptoms and not testing him. It seemed clear to Earl, a young, intelligent nurse, that something was grossly negligent, if not worse.

49.    Plaintiff spoke to the day nurse and his night supervisor. He told them that the patient did not have any protection, and he could not get a mask or for Plaintiff's protection.

50.    One of these nurses said, as late as the end of March 2020, "I've lived through three of these end-of-the-world pandemics, and we'll be ok."

51.    He texted his direct manager, Megan Hanys, and told her that he lives with senior parents who are hypertensive, diabetic, and obese: risk factors that can make this virus deadly should they contract it.

52.    Plaintiff also told Hanys that he had had Chronic Kidney Disease since he had been an infant; he reminded her that the reports from China show the virus can shut the kidneys down.

53.    But Hanys did not fulfill Bon Secours' religious, charitable mission or even see the obvious in a primarily secular and objective way. Condescendingly, she told Plaintiff down.

54.    Plaintiff then went above her and told the charge nurse that the patient – and, thus, he – needed better care. That nurse, in turn, came into the room, looked at the patient's chart, and remained silent. The charge nurse did not refute Plaintiff likely; there was nothing the charge nurse could do.

55.    Plaintiff, many times, started looking for supplies to protect him. He found one surgical mask, though, as part of his duties, he had to suction virus-laden gunk out of the disabled patient's windpipe.

56.    Another nurse also assigned to the patient told Plaintiff she was sure COVID was at play.

57.    All the N95 masks were being kept with the supervisors or designated only for suspected COVID-19 patients. Plaintiff spoke to Marie Van DeVere, the supervisor that evening, and said how uncomfortable he was to be taking care of this patient, his air passages fully exposed. Plaintiff noted he could not understand the rationale for not testing this patient for COVID-19. At least a positive test would have allowed some protection for Plaintiff and less painful death than the Hospital forced upon The Patient.

58.    Plaintiff left his shift after the evening. Upon returning to work in two or three days, he learned the patient had died of COVID.

59.    Plaintiff went home, was swab tested, and started suffering COVID symptoms. After

60.    waiting five days for the result, he learned he tested positive.

61.    He followed CDC guidelines – i.e., as to when to go in and out of isolation. Then he called the Hospital in a week.

62.    The CDC rules require discontinuing isolation only after (1) seven days from the onset of symptoms; (2) and on the eighth to be without fever for three days without Tylenol and have a general improvement of symptoms.

63.    He called his primary care doctor, especially given that he has kidney disease. His doctor told him that he should not contact immunocompromised people with his infection and health condition.

64.    He stayed in isolation from approximately March 16-30, 2020.

65.    He tested negative, but he felt terrible after seven days and stayed out of work until April 7 (approximately), when he felt well enough to work.

66.    He reported to the command center, which Samaritan converted into a fit-testing station. Mr. Earl said that it is "his first night back, and He has been infected." Both masks available did not work because he tasted the solution, yet he could not get a PAPR.

67.    He worked two nights with an N95 respirator. The first night, the mask would just come off his face. There was no one left to whom he could complain, except OSHA, which he did.

68.    The next day he went to the command center, and, still, there were no new masks.

69.    His supervisor, Nurse Adrianne, said, "Didn't you get fit tested yesterday."

70.    Plaintiff replied, "Yes, but the mask was too small."

71.     Adrianne contradicted him as if to refute reality, saying, "You passed yesterday. What games are you playing?"

72.     The suggestion of "game-playing" was purely to insult and demean Mr. Earl when he said, "No, [the fit tester] just took the best one available. I've been infected already, and I just want something to work for me."

73.     It wasn't much to ask.

74.     Adrianne replied incredibly, "What do you want us to do about it?"

75.     Plaintiff said, "All He wants is a mask that fits."

76.     Adrianne had no answer, and she wanted Plaintiff to bend her will or to quit.

77.     An occupational health nurse added, "He needs the PAPR."

78.     Adrianne said, "We don't have any, and we need to find something else that will work." But there was no search. Plaintiff was absent for three weeks, and the Hospital did nothing during that time to accommodate him. Indeed, while isolated, Plaintiff, his regular manager, about the PAPR, and the manager said, "Just get fit tested again." Plaintiff's response was irrefutable: "How can He be accurately fit-tested since the test measures smell and taste?" At the time plaintiff had very little smell or taste – the same is true today.[3]

---

[3] There is no contradiction here. At the time, plaintiff was unaware that he had lost smell to the extent that he had. Nevertheless, the OSHA guidelines required a PAPR. Had defendants asked him to shave his beard, he would have considered it, but that is the nature of the interactive dialogue, required by the Rehabilitation

79.     Amazon delivers quickly, and Plaintiff had gone home or done something else in the meantime. At the same time, Bon Secours fulfilled its mission to the needy – in this case and already failed the special-needs adult.

80.     The occupational nurse who stood by (and advocated) for Plaintiff Adrianne said, "Can't he go to a clean unit?" She was referring to a non-COVID unit.

81.     There had been a unit opened for non-COVID patients in a building formerly used for chronic dialysis patients.

82.     Adrianne's response to the occupational health nurse (who knew better) about Nicholas: "He's a critical care nurse." In other words, because Good Samaritan hired him as a critical care nurse – and despite that Samaritan put him in more harms' way than other patients – he would not receive accommodation with a less dangerous job. This refusal was not only a pretext – Plaintiff easily could have been transferred – but a failure to engage in an interactive dialogue to find accommodation was a violation of the law and evidence of discrimination. Adrianne did not want any accommodations for any nurses, nor did the Hospital.

83.     Plaintiff easily could have been accommodated. ICU is a challenging assignment, but there were other jobs of lesser risk to Plaintiff he was qualified, given his nursing education and training.

84.    So it was Hobson's choice for Plaintiff to get reinfected or quit, and that was where Samaritan was angling him. He called his parents about this untenable situation, and they agreed he should resign.

85.    He sent a resignation letter that Wednesday morning. He gave two weeks' notice and emailed again to follow up.

86.    He made clear he would not work in I.C.U./critical care unless he got a PAPR or worked in a non-COVID unit. He added, "Let me know if we can resolve this."

87.    Adrianne's response was first that there was nothing to do to resolve this. All along, she wanted to see him go for creating a ruckus by getting COVID and demanding a safe workplace. "I'm sorry you're leaving," she said disingenuously, but I understand."

88.    Plaintiff's occupational health nurse (at Samaritan) said he couldn't be taking care of critical patients without a proper mask. Adrianne violated her oath and didn't care about the more competent occupational health nurse.

89.    As far as working in one of the "clean units," this would not have been contraindicated. At the time, the Stanford Medical School reported that after a 14-day quarantine, someone "who has been      released      from quarantine is not considered a      risk   for   spreading." *See*

https://stanfordhealthcare.org/stanford-health-care-now/2020/novel-

coronavirus/faqs-aboutcovid-19.html (citing CDC guidelines and last visited on April 17, 2020). That was what was known then.

90.    Perhaps because of variants, this might not be true today; but it would not make a difference at the time.

91.    The facility continuously required staff to reuse N95 masks for a workweek or 36 hours, regardless of manufacturers' recommendations or concerns raised by staff. Samaritan instructed the nurses to place contaminated covers in a lunch bag, then bring the baggies home, maybe cleaned and brought back to the next shift, and reused again.

92.    The Hospital gave staff one plastic gown per shift and instructed them to "wipe it down" between patients with antimicrobial wipes and hang it up to air dry.

93.    These are one-piece gowns donned and doffed puts the neck over the nurse's, past his face. This action, done multiple times a day, putting the wear their management was shamed.

94.    Staff raised concerns that this procedure was unsafe, but management was shamed that a wipe down made everything disinfected. But in wiping down, the antimicrobial wipes – which are not for use on skin – would unavoidably touch the nurses' skin. Many reported irritations due to fumes and stinging.

95.    As of 4/14/20, there were 65 staff members out sick due to a lack of appropriate PPE.

96.     If he wore a proper mask, Plaintiff would have been safe to himself and others. His mouth and nose would be covered, and he wasn't coughing or sneezing anymore. His hands would be clean. He had spent time not enough timeline and had tested negative.

97.     The Hospital not only refused accommodation but discriminated against him directly by refusing to reassign him *and* refusing toto refuse a measly $1,800 to protect a young, dedicated, good nurse's life.

98.     Without the PAPR (or the transfer) plaintiff could not work. The ICU was more dangerous for him because he knew to avoid any immunocompromised patients, which populate the critical care portions of the Hospital. (This includes COVID patients.)

99.     After he quit, he got a call from Phyllis M. Yezzo, D.N.P., RN, CPHQ, NEA-BC, SVP, Patient Care Services, and Chief Nursing Officer. She is also a professor of nursing at New Rochelle College. Likely, a lawyer told her to make the call

100.   Yezzo asked Plaintiff to stay – although in what capacity she did not say. She did say that the PAPR's at the Hospital needed the $125 cartridges mentioned above, so she was steering him into her decision that he would get no PAPR. But the cartridges could easily have been ordered if, indeed, there were no cartridges. Yezzo was probably lying because if the Hospital had no PAPR's, it was an OSHA violation.

101.   The Hospital probably had none and kept changing its story. But Good Samaritan could have ordered a cartridge. Plaintiff, wanting to be polite, ended the call saying he'd think about it.

102.   The next day, he responded by email:

> I have thought about our phone call thoroughly over the past day. The whole reason I decided to leave Good Samaritan Hospital was that I was unprotected from COVID-19. I was already infected once while working there, only to return to work to be told He would not have a PAPR device, or a properly fitting mask available for his use. While on the phone, you stated that only droplet precautions are required while helping patients infected with the virus. As an ICU nurse in this pandemic, I am exclusively working with patients that . . . need to be suctioned, creating aerosol particles as outlined on the CDC website. You also stated that your glasses were fogging with the N-95 mask on. I was confused as to why you [we]re about a respirator are if you believe[d] staff entering COVID patients' rooms only require droplet precautions. [This was a reference to a phone conversation in which Yezzo tried to convince Plaintiff that an N95 was not worth the bother.] I feel that in the three weeks He was isolated at home with COVID-19, the Hospital could have invested in a PAPR device for his protection or at least replaced the "cartridges" on the broken ones, as you said. A reasonable accommodation would be to place me in a NON-COVID unit. Adrianne already made it clear that, because I [cannot return to a non-covid unit], I will not be returning to Good Samaritan Hospital unless a PAPR device is made available, or I would be exclusively placed on a 'clean' unit. If not, I will be applying for COVID enhanced unemployment benefits and start looking for new employment elsewhere. I feel that I have been more than fair under the circumstances, even after the Director of Nursing [Adrianne] insulted his integrity and disregarded his safety. I will wait until 5 P.M. Wednesday, April 15th, for your answer. Thank you for your time.

118.   The young nurse with integrity told it like it was – and called Yezzo out on her contradiction that nurses didn't need N95's – a pure lie – yet she used one for herself.

119.   Her response, again, was a lie: "Thank you for getting back to me. He was hoping you would reconsider returning to GSH. I am disappointed you have not reconsidered. Please know we are open to exploring your return in the future should you change your mind."

120.   Should Plaintiff have reconsidered" his wish to be alive and stay safe? Nurse Yezzo, indeed, should be "disappointed," mostly in herself. She discriminated against Plaintiff and put him in a position such that – knowing he was a good nurse – would put his life in danger. Both were violations of her oath as a nurse.[4] Even if she acted as a mouthpiece to ensure that Plaintiff the Hospital did not fire him, she failed in Bon Secours' stated mission to God and the sick. She should be ashamed, and if not, the Hospital should pay.

121.   While Defendant indubitably tried to fudge the facts not to fire Plaintiff or make it seem as if it were a constructive termination, this indeed was. To use Nurse

---

[4] The Nurse's Oath, known as the Nightingale Pledge, reads: "I solemnly pledge myself before God and in the presence of this assembly to pass his life in purity and to practice his profession faithfully. He will abstain from whatever is deleterious and mischievous and will not take or knowingly administer any harmful drug." Yezzo had acted impurely, put plaintiff in harm's way, sauntering him out of a job by not giving him basic protections.

Yezzo's self-righteous words, Plaintiff was "disappointed" that Bon Secours had "not reconsidered."

122.   Defendants lost an excellent young nurse, who has suffered much because he just asked for life-saving protections. He rightly sues for redress.

COUNT ONE
FAILURE TO ACCOMMODATE
REHABILITATION ACT & AMERICANS WITH DISABILITIES ACT

100.   Plaintiff repeats realleges and incorporates by reference every allegation previously made above. Insofar as the ADA and the Rehabilitation Act elements are similar, he will recite them simultaneously.

101.   Defendants receive many forms of federal financial assistance and are "employers" under the Rehabilitation and Americans with Disabilities Acts.

102.   Plaintiff filed a charge within 300 days of his termination and got a right to sue within the previous week.

103.   Plaintiff is a covered employee under the ADA and Rehabilitation Act because (a) he had a record of a disability. He recovered from COVID-19, a condition that can kill, but that substantially limits one or more major life activities, such as breathing, taste, and smell; (b) defendants perceived him to have a continued disability despite having emerged from quarantine under CDC guidelines.

104.   Plaintiff also told his supervisor that he had a chronic kidney condition that substantially limits his ability to eat certain foods and, more importantly, filter nutrients from the bloodstream and eliminate waste.

> (a) Defendant refused to accommodate Plaintiff by giving him a proper respirator;

(b) Refusing to change his assignment to one of the other units, where jobs were available.

105.   As a result, Plaintiff will continue to suffer monetary damages, severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses determined at trial.

## COUNT TWO
## REHABILITATION ACT/AMERICANS WITH DISABILITIES ACT ANIMUS BASED ON ACTUAL OR PERCEIVED DISABILITY

106.   Plaintiff repeats realleges and incorporates by reference every allegation previously made above.

107.   Defendant perceived Plaintiff as contagious in refusing to assign him to one of the "clean" units and a higher risk to the Hospital given his kidney disease.

108.   If Defendant wanted Plaintiff to work, it would have found a PAPR or assigned him to a "clean" unit

109.   It failed to do so purely out of stigma and fear, grounded in discrimination based on disability.

110.   As a result of the preceding, Plaintiff was damaged.

## COUNT FOUR
## DISABILITY DISCRIMINATION UNDER NY HUMAN RIGHTS LAW FAILURE TO ACCOMMODATE

111.   Plaintiff repeats and realleges all previous paragraphs as if set forth herein.

112.   As a result of the preceding, Plaintiff has been damaged.

COUNT FIVE
RETALIATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW
ANIMUS BASED ON ACTUAL OR PERCEIVED DISABILITY

113.    Plaintiff repeats and realleges all previous paragraphs as if set forth herein.

114.    As a result of the preceding, Plaintiff has been damaged.

COUNT SIX
VIOLATION OF NEW YORK LABOR LAW § 741

115.    Plaintiff repeats and realleges all previous paragraphs.

116.    Defendant took retaliatory action against Plaintiff in that he (a) disclosed to a supervisor a policy or practice of the employer that Plaintiff, in good faith, believed constituted improper quality of patient care; and (b) objected or refused to participate in such activity.

117.    Plaintiff brought the inadequate quality of patient care to the attention of a supervisor and afforded the employer a reasonable opportunity to correct such activity, policy, or practice.

118.    As a result of the preceding, Plaintiff was constructively discharged.

119.    Plaintiff has been damaged and is entitled to reasonable attorneys' fees.

COUNT SEVEN
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

120.    Plaintiff repeats and realleges all previous paragraphs as if set forth herein.

121.    Defendant Samaritan and Bon Secours' conduct was 'so outrageous in character, and so extreme, as to go beyond all possible bounds of decency. It was utterly intolerable in a civilized community.

122.    Defendants sent Plaintiff into a whirlwind of panic and fear. Being in his early twenties, with Chronic Kidney Disease, living with elderly parents with multiple chronic conditions, he feared the absolute worst for everyone.

123.    He has yet to be diagnosed but is seeking medical care.

124.    He was emotionally stable before this, so the causation is plain.

125.    The intentional actions of the Hospital include but are not limited to:

(a) failing to recognize the apparent COVID symptoms of the patient who died;

(b) failing to procure a PAPR;

(c) lying to Plaintiff inability to obtain a PAPR (or that those in the The Hospital that needed cartridges);

(c) accusing him of "playing games" when he simply asked for proper PPE.

126.    As a result of the preceding, Plaintiff has been damaged.

COUNT EIGHT
INTENTIONAL OR RECKLESS OF COVID TRANSMISSION

127.    Plaintiff repeats and realleges all previous paragraphs as if set forth herein.

128.    Defendants acted in bad faith or lying, and the bad faith and lie harmed Plaintiff on the misrepresentation (or material omission).

129.    The misrepresentation of material fact was that the disabled patient should not be tested for COVID and not treated as other COVID-positive patients. Indeed, any competent doctor would know that the patient had COVID. The Hospital likely discriminated against him because of his special needs and because he did not have a family to advocate for him – nor could he for himself.

130.    The assertion that the patient either did not have COVID or should not test for COVID was a lie that not only hastened the patient's painful death but put Plaintiff's position of not having proper health protections.

131.    The patient was merely left to die in pain and alone. The only person blowing the whistle to advocate for him was Plaintiff be rebuffed by the nurses who were his superiors. 135. Plaintiff was skeptical of the information but relied on it – how could he know that the defendants would be so evil?

136.    Plaintiff suffered injury from this reliance – pain and suffering, both mental and physical.

137.    Defendants sent Plaintiff into a whirlwind of panic and fear. Being in his early twenties, with Chronic Kidney Disease, living with elderly parents with multiple chronic conditions, he feared the absolute worst for everyone.

138.    He has yet to be diagnosed but is seeking medical care.

139.    He was emotionally stable before this, so the causation is plain.

140.    The intentional actions of the Hospital include but are not limited to:

141.    As a result of the preceding, Plaintiff has been damaged.[5]

WHEREFORE, Plaintiff that this Court order the following relief in favor of Plaintiff:

I. Compensatory damages in an amount no less than $1,000,000 to Plaintiff whole for any earnings, including bonus payments, he would have received but for Defendants' discriminatory treatment and constructive termination, including but not limited to, back pay, front pay, and

---

[5] While New York law usually relegates claims for injuries in the workplace to Worker's Compensation, an intentional damage by the employer – or its employee – is an exception to the NY Worker's Compensation Law bar. An injury is sustained to an employee due to an intentional tort perpetrated by the employer or at the employer's direction. The Workmen's Compensation Law is not a bar to a common-law action for damages. *See Jones v. State*, 96 A.D.2d 105 (4th Dept. 1983) (citing *Lavin v. Goldberg Bldg. Material Corp.,* 274 App. Div. 690 (3rd Dept. 1949) (worker died from assault by fellow worker). As the Appellate Division recited the "general rule" in *Jones,* "an employee injured in the course of employment is relegated to workers' compensation as his exclusive remedy . . . [Except if] injury results from "an intentional tort perpetrated by the employer or at the employer's direction, the

[Workers'] Compensation Law is not a bar to a common-law action for damages. To recover for his injuries under the intentional tort exception, the employee must establish that the employer . . . that the acts of the employer constituting [an intentional tort] were deliberate and not merely reckless, and the employee's burden of proof on these issues has been characterized as "heavy." *Id.,* 96 A.D.2d at 106. Plaintiff accepts that the burden might be high. Still, the facts demonstrate that evil acts in derogation of the patient and Plaintiff into action by defendants deserve discovery on this cause of action.

II.     Compensatory damages bestowing upon plaintiff money damages for mental anguish, loss of dignity, humiliation, and injury to livelihood that is fair, just, and reasonable amount, to be determined at trial.

III.    Attorneys' fees under the Rehabilitation Act and such other statutes that allow it;

IV.     Punitive damages to be determined by the trier of fact;

V.      Prejudgment interest and costs; and

VI.     Such other and further relief that the Court may deem just and proper.

Dated: Queens, New York
          November 9, 2021

          *Greg S. Antollino*
GREGORY ANTOLLINO, ESQ.
116 West 23rd Street, Suite 500
NEW YORK, NY 10011
(212) 334-7397
gregory@antollino.com