UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ____09/06/2022____
```

NICHOLAS EARL,

                              Plaintiff,

    -against-

GOOD SAMARITAN HOSPITAL OF SUFFERN        No. 20 Civ. 3119 (NSR)
NY, BON SECOURS CHARITY HEALTH              OPINION & ORDER
SYSTEM, and WESTCHESTER HEALTH CARE
FOUNDATION, INC., *d/b/a*
WESTCHESCHESTER HEALTH CARE
NETWORK, INC.,

                              Defendants.

NELSON S. ROMÁN, United States District Judge

    Plaintiff Nicholas Earl, a critical care nurse, commenced this action against Good

Samaritan Hospital of Suffern (the "Hospital"), Bon Secours Charity Health System ("Bon

Secours"), and Westchester County Health Care Corporation, doing business as WMCHealth[1]

("WMC"). He alleges that in March 2020, at the beginning of the COVID-19 pandemic, while he

was working for the Hospital as a critical care nurse, Defendants denied him access to necessary

protective equipment—a Powered Air Purifying Respirator (PAPR)—and assigned him to a

special needs patient who spread COVID-19 to him. He further avers that after he was out with

COVID-19 for nearly a month, the Hospital refused to accommodate him upon his return either by

---

[1] Despite Defendants having informed Plaintiff through their first motion to dismiss that Westchester Health Care Foundation, Inc. and Westchester Health Care Network are not actual entities, Plaintiff still named them as defendants in his Second Amended Complaint. Defendants aver that the correct entities which they assume Plaintiff intended to sue are Westchester Medical Center Foundation, which is the not-for-profit, development, and fundraising arm that supports Westchester Medical Center's healthcare mission and an entity called Westchester County Health Care Corporation ("WCHCC"), which is a public benefit corporation established under the laws of the state of New York, which does business as Westchester Medical Center, Westchester Medical Center Health Network, and WMCHealth ("WMC"). For purposes of briefing the instant motion, Defendants assumed that Plaintiff intended to sue WMC. (ECF No. 45 at 9 n1.) Accordingly, the Court similarly refers to WMC as the intended defendant-entity throught this opinion and order.

providing him a PAPR, transferring him to a non-COVID-19 (or "clean" unit) and, therefore, constructively discharged him. Plaintiff asserts claims for failure to accommodate and discrimination in violation of the Rehabilitation Act and the Americans With Disabilities Act ("ADA"), for discrimination and retaliation in violation of the New York State Human Rights Law ("NYSHRL"), for violation of New York Labor Law Section 741, for intentional infliction of emotional distress, and an unspecified tort claim he styles as "intentional or reckless of COVID transmission."

Presently before the Court is Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 44). For the reasons that follow, the Court GRANTS Defendants' motion.

## BACKGROUND

The following facts are derived from the Second Amended Complaint ("SAC", ECF No. 37) and are taken as true and constructed in the light most favorable to Plaintiff for the purposes of this motion.[2]

### I.  Factual Background

Plaintiff has had chronic kidney disease since he was an infant. (SAC ¶ 52.) Plaintiff

---

[2] The Court notes that some of Plaintiff's allegations describe events that are not necessarily in chronological order and that fail to include certain salient facts, which make it difficult to comprehend how certain allegations occurred in relation to each other. Further, many of Plaintiff's allegations seem to assert factual conclusions which cannot be reasonably inferred from the rest of his allegations.

To be sure, for purposes of this motion, the Court recognizes that it must accept all factual allegations in the SAC as true and draw all reasonable inferences in Plaintiff's favor. *Freidus v. Barclays Bank PLC,* 734 F.3d 132, 137 (2d Cir. 2013). However, the [C]ourt cannot simply 'fill in the blanks' to supply what is missing, on a motion to dismiss," *Read v. Corning Inc.,* 351 F. Supp. 3d 342, 357 (W.D.N.Y. 2018), "or follow a bread crumb trail of a represented plaintiff." *Jackson v. Cnty. of Onondaga,* No. 917CV845GLSCFH, 2019 WL 355729, at *4 (N.D.N.Y. Jan. 28, 2019). Put differently, at this stage, the Court is not required to either speculate or puzzle out Plaintiff's allegations in such a way that the Court would be effectively pleading his claims for him. With that in mind, the following compilation of facts is the result of the Court's attempt to figure out the logical temporal order that Plaintiff may have originally intended.

graduated from nursing school in 2018 and began working as a nurse in the surgical intensive care unit at the Hospital in October 2018. (*Id.* ¶ 27.) Plaintiff alleges that the Hospital is "governed by co-employers Bon Secours and Westchester Health Care Network." (*Id.* ¶ 6.) He further avers that the Hospital is "controlled and funded by Bon Secours and Westchester Health." (*Id.* ¶¶ 14, 20, 22–23.)

In October 2019, Plaintiff underwent a "fit test" to ensure that he was outfitted with a mask with a proper seal. (*Id.* ¶ 32.) Plaintiff alleges that his original fit test indicated that he needed a PAPR (*id.* ¶ 33), and the Hospital "registered on his card . . . that he *would* fit for a PAPR" (*id.* ¶ 36 (emphasis in original)). Though Plaintiff repeatedly asked for a PAPR, he was never provided with one. (*Id.* ¶¶ 34–36.) Plaintiff alleges that a PAPR usually costs about $300 and, to properly function, requires a $125 cartridge, which lasts about five years. (*Id.* ¶ 35.) Plaintiff acknowledges that at the time of the incidents alleged, PAPRs could be purchased for $1,700 on Amazon.com. (*Id.* ¶ 35; *see also id.* ¶ 97 (alleging that at the time of the incidents alleged, the PAPR and cartridge together would have cost Defendants about $1,800).)

In March 2020, at the beginning of the COVID-19 pandemic, Plaintiff was assigned to care for a gravely ill special-needs patient the night before he died. (*Id.* ¶ 41.) Plaintiff alleges that he was assigned to this patient because he is male, and Plaintiff was one of the few male nurses at the Hospital. (*Id.* ¶ 18.) The patient had pneumonia and had earlier been in a negative-pressure room. (*Id.* ¶ 42.) At some point, one of the Hospital's doctors told Plaintiff that pneumonia needed to be on both sides of the lungs to justify a COVID test, and thus, the patient did not need a COVID test or to be treated as COVID-positive. (*Id.* ¶¶ 43–45.) Plaintiff alleges that the failure to test the patient for COVID-19 or treat him as COVID-19 positive was significant because at the time, all N95 masks were being kept by the supervisors or designated only for use with suspected COVID-

19 patients. (*Id.* ¶ 57.) Additionally, the patient was removed from the negative-pressure room and was not fitted with a non-rebreather mask, which was not allowing him to absorb enough oxygen. (*Id.* ¶¶ 47–48.)

Plaintiff alleges that when he cared for him, the patient showed "classic symptoms of COVID" including a fever of 103 degrees, low oxygen saturation, profusely sweating, and brain stat. (*Id.* ¶¶ 41, 46–47.) He alleges that another nurse also believed the patient had COVID. (*Id.* ¶ 56.) Plaintiff reported to the day nurse and his night supervisor that the patient did not have any protections and that Plaintiff could not get a satisfactory mask for his own protection. (*Id.* ¶ 49.) One of the nurses responded, "I've lived through three of these end-of-the-world pandemics, and we'll be ok." (*Id.* ¶ 50.) Plaintiff then texted his direct manager, Megan Hanys and told her that he lives with parents who have risk factors for COVID—hypertensive, diabetic, and obese—and that Plaintiff has chronic kidney disease and that reports from China indicate that COVID-19 can shut the kidneys down. (*Id.* ¶¶ 51–52.) Hanys told Plaintiff to calm down. (*Id.* ¶ 53.) Plaintiff went above Hanys and told the charge nurse that he and the patient needed better care. (*Id.* ¶ 54.) Plaintiff spoke to the evening supervisor, Marie Van DeVere about how uncomfortable he was caring for the patient with his "air passages fully exposed." (*Id.* ¶ 57.) Plaintiff searched for supplies to protect himself and was able to find one surgical mask, which was inadequate because part of Plaintiff's duties including suctioning "virus-laden gunk out of the disabled patient's windpipe." (*Id.* ¶ 55.) Plaintiff left after his evening shift. (*Id.* ¶ 58.)

When Plaintiff returned to work two or three days later, he learned that the special-needs patient had died. (*Id.*) The patient's family insisted on a post-mortem COVID test, which came back positive. (*Id.* ¶ 8.) Plaintiff then tested for COVID-19 and began feeling the virus's symptoms during the five days it took to receive his positive test result. (*Id.* ¶¶ 59–60.) Plaintiff's primary

care doctor told him that given his kidney disease and the COVID-19 infection, "he should not be in contact with immunocompromised people." (*Id.* ¶ 63.) Plaintiff's occupational health nurse at the Hospital said that he could not care for critical patients without a proper mask. (*Id.* ¶ 88.)

Due to the Centers for Disease Control ("CDC") guidelines and that he still felt poorly for nearly a week after he tested negative for COVID-19, Plaintiff was out of work for approximately three weeks. (*Id.* ¶¶ 61–65.) Plaintiff alleges that while he was out with COVID-19, he spoke to his regular manager about his need for a PAPR and that the manager said, "just get fit tested again." (*Id.* ¶ 78.) Plaintiff responded that he could not accurately fit-test at the time because the test measures taste and smell, which he had lost due to COVID-19. (*Id.*)

Upon his return to work, Plaintiff reported to the fit-testing station where he told the tester that it was his first night back after having COVID-19. (*Id.* ¶ 66.) Plaintiff alleges that he failed the fit test with both available masks as he still tasted the solution during the test. (*Id.*) He worked for two nights with an N95 respirator. (*Id.* ¶ 67.) On the first night, "the mask would just come off his face." (*Id.*) The next day, he went back to the fit-testing station but they had no new masks. (*Id.* ¶ 68.) When he raised the issue with his supervisor, Nurse Adrianne, said "didn't you get fit tested yesterday," to which Plaintiff responded that he had but that the mask was too small, to which Nurse Adrianne responded "You passed yesterday. What games are you playing?" (*Id.* ¶¶ 69–71.) When Nurse Adrienne asked what Plaintiff wanted, he said "All I want is a mask that fits." (*Id.* ¶¶ 74–75.) An occupational health nurse said, "He needs a PAPR," to which Nurse Adrienne said "We don't have any. We need to find something else that will work." (*Id.* ¶¶ 77–78.) The occupational health nurse then said to Nurse Adrienne "Can't he go to a clean unit?"—referring to a newly opened unit for non-COVID patients—to which Nurse Adrienne responded, "He's a critical care nurse." (*Id.* ¶¶ 80–82.) Plaintiff alleges that based on his nurse education and training,

there were other jobs of lesser risk—such as in a "clean unit"—for which Plaintiff was qualified. (*Id.* ¶ 83.)

After some time, Plaintiff submitted his resignation by providing two-weeks' notice, suggesting that he would be willing to work in a non-COVID unit or with a PAPR in the critical care unit. (*Id.* ¶¶ 84–85.) Plaintiff received a call from Phyllis M. Yezzo, the Chief Nursing Officer, who indicated that she wanted Plaintiff to return to the Hospital, but that the Hospital could not give him a PAPR because they did not have the requisite $125 cartridges. (*Id.* ¶ 99.) The next day, Plaintiff responded by email indicating that he would not return to the Hospital unless he received a PAPR or was placed in a clean unit. (*Id.* ¶ 102.) Nurse Yezzo responded "Thank you for getting back to me. I was hoping you would reconsider returning to [the Hospital]. I am disappointed you have not reconsidered. Please know we are open to exploring your return in future should you change your mind." (*Id.* ¶ 119.)

## II. Procedural Background

Plaintiff commenced this action on April 18, 2020. (ECF No. 1.) Plaintiff filed an Amended Complaint on September 21, 2020. (ECF No. 20.) After Defendants asked for leave to file their motion to dismiss, the Court granted them leave to do so and issued a briefing schedule accordingly. (ECF Nos. 21 & 24.) After the parties filed their briefing, the Court granted Defendants' first motion to dismiss in its entirety and granted Plaintiff leave to file a second amended complaint. (ECF No. 32.)

On November 15, 2021, Plaintiff filed his SAC. (SAC, No. 37.) After Defendants asked for leave to file the instant motion to dismiss, the Court granted them leave to do so and issued a briefing schedule accordingly. (ECF Nos. 38 & 40.) On February 10, 2022, the parties filed their respective briefing on the instant motion: Defendants filed their notice of motion (ECF No. 44), memorandum of law ("Motion," ECF No. 45), and reply ("Reply," ECF No. 46); and Plaintiff filed

his response in opposition ("Response in Opposition," ECF No. 43).

## STANDARD

In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Freidus v. Barclays Bank PLC,* 734 F.3d 132, 137 (2d Cir. 2013). To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action will not do"; rather, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. In applying these principles, the Court may consider facts alleged in the complaint and documents attached to it or incorporated by reference. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir. 2002) (internal quotation marks and citation omitted).

In assessing the sufficiency of the claims, the court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013). While legal conclusions may provide the "framework of a complaint," "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678–79. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* at 678.

## DISCUSSION

By his SAC, Plaintiff asserts a total of nine claims: (1) a Rehabilitation Act claim for failure to accommodate him for his disability; (2) an ADA claim for failure to accommodate him for his disability; (3) a Rehabilitation Act discrimination claim based on actual or perceived disability; (4) an ADA discrimination claim based on actual or perceived disability; (5) a New York State

Human Rights Law ("NYSHRL") claim for failure to accommodate him for his disability; (6) a NYSHRL retaliation claim based on actual or perceived disability; (7) a claim for a violation of New York Labor Law Section 741; (8) a common-law claim for intentional infliction of emotional distress; and (9) an unspecified claim he styles as "intentional or reckless of COVID transmission."[3,4]

By their motion, Defendants argue that Plaintiff's claims fail for a number of reasons, including for failure to state a claim and because Plaintiff failed to comply with the notice-of-claim requirements for his state law claims prior to commencing the instant action. (Mot. at 14–33.) The Court addresses Defendants' arguments in the order they present them in their motion.

## I.    Plaintiff Concedes that All Claims Against WMC Must Be Dismissed

As a preliminary matter, the Court notes that the parties expressly agreed in their briefing that WMC must be dismissed from this action because it never employed Plaintiff. (*Compare* Mot. at 14–15, *with* Resp. in Opp'n at 14, n.14, *and* Reply at 6.) Accordingly, the Court dismisses all federal and state claims against the WMC.

## II.    All Claims Against BSCHS Must Also Be Dismissed

Defendants first argue that all of Plaintiff's claims against BSCHS must be dismissed because BSCHS is a separate legal entity from the Hospital, which was Plaintiff's employer during the relevant period. (Mot. at 15.) Defendants contend that Plaintiff not only makes conclusory allegations about the corporate relationship between BSCHS and the Hospital, but that he also fails

---

[3] Plaintiff alleges in passing that he was assigned to the patient and therefore unjustly exposed to COVID-19 because he was male. The SAC does not include causes of action for age or gender discrimination. Accordingly, the Court need not consider these theories at this juncture.

[4] Insofar as Plaintiff suggests that Defendants failed to comply with federal workplace standards, that claim is not properly before the Court. *See, e.g.*, *Palmer v. Amazon.com, Inc.*, 498 F. Supp. 3d 359, 368-69 (E.D.N.Y. 2020) (declining to consider warehouse worker claims that employer failed to follow federal workplace safety requirements during COVID-19 pandemic under doctrine of primary jurisdiction).

to sufficiently allege any facts to suggest that BSCHS was responsible for any purportedly actionable conduct. (*Id.*) After due consideration, the Court agrees.

"A parent company is not ordinarily liable for the employment discrimination of its subsidiary, except if the requirements of the single employer doctrine or the joint employer doctrine are satisfied." *Guzman v. News Corp.*, 09 CIV. 09323 LGS, 2013 WL 5807058, at *8 (S.D.N.Y. Oct. 28, 2013) (citing *Gulino v. New York State Educ. Dep't*, 460 F.3d 361, 378 (2d Cir. 2006)); *see also United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries.").

There are two "recognized doctrines that enable an employee in certain circumstances to assert employer liability against an entity that is not formally his or her employer[.]" *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 197 (2d Cir. 2005). "These doctrines are sometimes called the 'single employer' (or 'single integrated employer') and the 'joint employer' doctrines." *Id.*

"A 'single employer' situation exists where two nominally separate entities are actually part of a single integrated enterprise . . . .'" *Id.* at 198 (quoting *Clinton's Ditch Cooperative Co. v. NLRB*, 778 F.2d 132, 137 (2d Cir. 1985)). To determine whether a parent and subsidiary comprise a single employer subject to joint liability for employment-related acts, the court considers evidence of "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995). Although no one factor is determinative, "[t]he policy behind the single employer doctrine . . . is most implicated where one entity actually had control over the labor relations of the other entity, and, thus, bears direct responsibility for the

alleged wrong." *Murray v. Miner*, 74 F.3d 402, 405 (2d Cir. 1996).

In contrast, the "joint employer doctrine" provides that "an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer[.]" *Id.* Assessment of the joint-employer doctrine is particularly prudent in situations of "temporary employment or staffing agencies and their client entities." *Farzan v. Wells Fargo Bank, N.A.*, No. 12-CV-1217 (RJS) (JLC), 2013 WL 6231615, at *16 (S.D.N.Y. Dec. 2, 2013), *aff'd sub. nom. Farzan v. Genesis 10*, 619 F. App'x 15 (2d Cir. 2015); *see also Liotard v FedEx Corp.*, No. 14-CV-2083 (NSR), 2016 WL 1071034, *5 (S.D.N.Y. Mar. 17, 2016) (noting that joint employer doctrine particularly relevant in staffing agency circumstances).

Here, in his SAC, Plaintiff alleges that the Hospital is part of BSCHS and that the Hospital has not filed a tax return after BSCHS acquired it. (SAC ¶ 22.) He also alleges that the Hospital was "controlled and funded" by BSCHS. (*Id.* ¶ 24.) In fact, in their briefing, while Defendants argue that that Plaintiff was not employed by BSCHS, they nonetheless concede that the Hospital "is part of BSCHS." (Resp. in Opp'n at 10.)

At any rate, on these allegations alone, all that Plaintiff alleges is that the Hospital is the subsidiary of BSCHS—a fact that Defendants concede—but which by itself, is still insufficient to consider BSCHS as Plaintiff's employer. *See Guzman*, 2013 WL 5807058, at *8 ("There is a strong presumption that a parent is not the employer of its subsidiary's employees."). Indeed, even when drawing all inferences in his favor, Plaintiff at best only sufficiently establishes the third and fourth factors of the "single employer" doctrine—namely, that BSCHS and the Hospital have "common management" and "common ownership or financial control." *Cook*, 69 F.3d at 1240. And while

Plaintiff alleges in passing that BSCHS "controls" the Hospital, such allegation is merely conclusory because there are no other facts in the SAC from which the Court could reasonably infer that BSCHS, for example, "had control over the labor relations of the [Hospital], and, thus, bears direct responsibility for the alleged wrong." *Murray*, 74 F.3d at 405.

The Court recognizes that Plaintiff avers in his opposition that (i) BSCHS and the Hospital share the same address; and (ii) Yezzo, the Chief Nursing Officer who he alleges called him because she wanted him to return to the Hospital but that the Hospital could not provide him with a PAPR (SAC ¶ 99), is an employee of BSCHS. (Resp. in Opp'n at 9.) But these allegations are not contained within the SAC, and thus, the Court will not consider them because "[i]t 'is axiomatic that the [SAC] cannot be amended by the briefs in opposition to a motion to dismiss.'" *Cambridge Capital LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 453 n. 11 (S.D.N.Y. 2021) (citations omitted).

And lastly, contrary to Plaintiff's arguments, none of the allegations in the SAC suggest that the "joint employer" doctrine applies here. *See, e.g.*, *Shiflett v. Scores Holding Co., Inc.*, 601 F. App'x 28, 30 (2d Cir. 2015) (noting that "factors courts have used to examine whether an entity constitutes a joint employer of an individual include 'commonality of hiring, firing, discipline, pay, insurance, records, and supervision[.]'").

Accordingly, the Court dismisses all of Plaintiff's federal and state claims against BSCHS.

## III.    ADA and Rehabilitation Act Discrimination Claims

### A.    Exhaustion of Administrative Remedies

Before addressing Defendants' arguments on these claims, as a threshold matter, the Court addresses whether Plaintiff properly exhausted his administrative remedies with respect to his ADA claims before bringing the instant suit.

"Exhaustion of administrative remedies and the timely filing of a complaint with the [Equal Employment Opportunity Commission ("EEOC")] are preconditions to filing an ADA action in

federal court." *Cohn v. KeySpan Corp.*, 713 F. Supp. 2d 143, 155 (E.D.N.Y. 2010) (citing *Curto v. Edmundson*, 392 F.3d 502, 503 (2d Cir. 2004)). This includes receiving a right-to-sue letter from the EEOC. *See* 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e–5; *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 291 (2002). Administrative exhaustion is an essential element of the ADA's statutory scheme, the purpose of which is to avoid unnecessary judicial action by the federal courts by "[giving] the administrative agency the opportunity to investigate, mediate, and take remedial action." *Johnson v. Xylem Inc.*, --- F. Supp. 3d ---, 1:19-CV-00130 EAW, 2020 WL 1963125, at *2 (W.D.N.Y. Apr. 16, 2020) (citing *Stewart v. United States Immigration & Naturalization Serv.*, 762 F.2d 193, 198 (2d Cir. 1985)).

Here, in his SAC, Plaintiff limits the discussion of his exhaustion of remedies to an unclear single sentence: "This action arises under the Constitution and laws of the United States, including . . . the [ADA], for which Plaintiff's week [sic] received a right-to-sue letter." (SAC ¶ 24.) Nowhere else is there any mention of the kinds of charges he brought before the EEOC, when he brought them, if there was any determination on such charges, or even about when the EEOC mailed his right-to-sue letter or when he received it. *See, e.g.*, *Tiberio v. Allergy Asthma Immunology of Rochester*, 664 F.3d 35, 37 (2d Cir. 2011) ("In order to be timely, a claim under the ADA must be filed in federal district court within 90 days of the claimant's receipt of a right-to-sue letter from the EEOC." (citations omitted)). Plaintiff did not even attach the purported right-to-sue-letter to his SAC. And notably, even Defendants note in their briefing that they have yet to see Plaintiff's purported EEOC charge or letter. (Mot. at 13 n.5.)

"Accordingly, Plaintiff's . . . ADA claims must be dismissed on the basis that the right-to-sue letter is a precondition to bringing [the] claims in federal court." *Johnson*, 2020 WL 1963125, at *2 (citing *Constantine v. U-Haul Int'l, Inc.*, 15-CV-1204, 2015 WL 7272211, at *2 (N.D.N.Y.

Nov. 16, 2015) (dismissing plaintiff's Title VII claim where plaintiff failed to demonstrate that she received an EEOC right-to-sue letter); *Parker v. Mack*, 09-CV-1049A, 2010 WL 11507368, at *3 (W.D.N.Y. Jan. 4, 2010) (holding that plaintiff's Title VII claims were subject to dismissal where the plaintiff did not submit a copy of his EEOC right-to-sue letter)); *accord Zook v. Legenhousen*, 322CV00510TJMML, 2022 WL 2105873, at *4 (N.D.N.Y. June 10, 2022), *report and recommendation adopted*, 322CV00510TJMML, 2022 WL 3542821 (N.D.N.Y. Aug. 17, 2022) (same).

That said, "[u]nlike ADA claims, exhaustion of administrative remedies is not a condition precedent to commencing a discrimination claim based upon disability against a recipient of federal funding pursuant to Section 504 of the Rehabilitation Act." *Cohn v. KeySpan Corp.*, 713 F. Supp. 2d 143, 158 (E.D.N.Y. 2010) (citing *Rodriguez v. International Leadership Charter School*, No. 08 Civ. 1012, 2009 WL 860622, at *5 (S.D.N.Y. Mar. 30, 2009) (holding that although a plaintiff must exhaust administrative remedies under the Rehabilitation Act prior to commencing suit against a federal employer, there is no such exhaustion requirement with respect to claims under the Rehabilitation Act against a recipient of federal funding); *Gilmore v. University of Rochester Strong Memorial Hospital Division*, 384 F. Supp. 2d 602, 609–610 n. 6 (W.D.N.Y. 2005) ("The Rehabilitation Act contains no explicit exhaustion requirement," with respect to claims against recipients of federal funding); *Freed v. Consolidated Rail Corp.,* 201 F.3d 188, 194 (3d Cir.2000) (holding that plaintiffs need not exhaust administrative remedies prior to commencing claims against recipients of federal funding pursuant to Section 504 of the Rehabilitation Act)). Hence, the Court proceeds to analyze Plaintiff's Rehabilitation Act against the Hospital as he alleges, and Defendants do not appear to dispute, that it is a recipient of federal funding. (*See* SAC ¶ 23.)

**B.**   Rehabilitation Act Claims

Plaintiff alleges that Defendants failed to accommodate him and discriminated against him for an actual or perceived disability in violation of the Rehabilitation Act. (SAC at 28–29.) But Defendants argue that Plaintiff's claims under the Rehabilitation Act fail because, like in his previously dismissed complaint, he still fails to state a disability or handicap as defined by the statute. (Mot. at 16.) After due consideration, the Court agrees with Defendants that Plaintiff still fails to plead a cognizable disability or handicap under the Rehabilitation Act.

The legal standards and analysis for discrimination claims under the ADA, Rehabilitation Act, and NYSHRL, are the same. *See Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999); *Rogers v. New York Univ.*, 250 F. Supp. 2d 310, 313 n.4 (S.D.N.Y. 2002)).[5] The ADA prohibits an employer from discriminating against an employee "because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). As defined by the ADA, "discrimination" includes, *inter alia*,

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless . . . [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the . . . [employer's] business.

*Id.* § 12112(b)(5)(A) (emphasis added). "[O]therwise qualified" means that the individual, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8).

The Rehabilitation Act, which prohibits disability-based discrimination by government agencies and other recipients of federal funds, is similar. Section 504(a) of the Rehabilitation Act

---

[5] On that basis, even if Plaintiff had sufficiently established that he had exhausted his remedies for his ADA claims, the following analysis shows that such claims would have still failed.

provides:

> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a).

Therefore, to plead a *prima facie* violation under the ADA or Rehabilitation Act, a Plaintiff must allege "(1) that [he] is a 'qualified individual' with a disability; (2) that the defendants are subject to one of the Acts; and (3) that [he] was 'denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or [was] otherwise discriminated against by defendants, by reason of [his] disabilit[y].'" *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 85 (2d Cir. 2004), *opinion corrected*, 511 F.3d 238 (2d Cir. 2004) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)) (all but first alterations in original).

Here, even when taking all his allegations as true and after drawing all inferences in his favor, the Court concludes that Plaintiff's Rehabilitation Act claims fail because, like in his previously dismissed complaint, Plaintiff still fails to plausibly allege that he is "disabled" or "handicapped." *See Earl v. Good Samaritan Hosp. of Suffern*, 20 CV 3119 (NSR), 2021 WL 4462413, at *5 (S.D.N.Y. Sept. 28, 2021). Specifically, Plaintiff fails to plausible allege that, *at the time of his employment at the Hospital*, he had an impairment that substantially limits one or more major life activities.

In arguing that he is a "qualified individual" with a disability, Plaintiff advances three bases for finding that he has an impairment that substantially limits one or more major life activities: (1) COVID-19, from which he admittedly recovered; (2) the Hospital perceived him as infectious and therefore disabled even after recovering from COVID-19; and (3) his chronic kidney disease, which put him at elevated risk of complications from further exposure to COVID-19.

The ADA contains a non-exhaustive list of "major life activities," which includes "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2). "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." 42 U.S.C. § 12102(4)(E).

Regulations promulgated under the Rehabilitation Act by the Department of Health and Human Services define a "a handicapped person" as "any person who (i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment," 45 C.F.R. § 84.3(j)(1), and a "qualified handicapped person" as one who "with reasonable accommodation, can perform the essential functions of the job in question." 45 C.F.R. § 84.3(l)(1).

With respect to COVID-19 in particular, the most recently updated "Technical Assistance Questions and Answers" from the EEOC provides that "depending on the specific facts involved in an individual employee's condition, a person with COVID-19 has an actual disability if the person's medical condition or any of its symptoms is a 'physical or mental' impairment that 'substantially limits one or more major life activities.'" EEOC, What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (last updated July 12, 2022).[6] As such, the EEOC recommends "[a]n

---

[6] While "[t]he EEOC Guidelines are not administrative regulations promulgated pursuant to formal procedures established by the Congress[,] . . . they do constitute '[t]he administrative interpretation of the Act by the enforcing agency,' and consequently they are 'entitled to great deference.'" *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 430–31 (1975) (citations omitted).

individualized assessment" and "a case-by-case determination" of "whether the effects of a person's COVID-19 substantially limit a major life activity." *Id.*

### 1.      COVID-19 as an Actual Disability

With respect to his first basis, Plaintiff fails to plausible allege that, *during his employment at the Hospital*, his COVID-19 infection was an impairment that substantially limited one or more major life activities. As a preliminary matter, the Court notes that even when drawing all inferences in his favor, it remains unclear whether Plaintiff suffered *all* of the alleged COVID-19 symptoms and limitations he includes in the SAC *at the time of his employment at the Hospital*.

Generally, to sufficiently allege that an impairment interferes with a major life activity, a plaintiff must elaborate on whether the alleged impairment interfered with his alleged major life activity "*during the period of alleged discrimination by Defendants.*" *Telemaque v. Marriott Int'l, Inc.,* 14 CIV. 6336 (ER), 2016 WL 406384, at *9 (S.D.N.Y. Feb. 2, 2016) (emphasis added). Further, the plaintiff's allegations must contain sufficient factual support for his or her purported limitations, such as describing in some "detail the frequency, duration, or severity of [his or her limitations]." *Kelly v. N.Y. State Office of Mental Health*, 200 F. Supp. 3d 378, 393 (E.D.N.Y. 2016).

If anything, the language that Plaintiff uses in his relevant allegations strongly suggest that his alleged impairments are long-term effects resulting from his COVID infection. (*See, e.g.*, SAC at 3 ("Plaintiff suffers from brain fog because of long COVID[.]"); *id.* at 4 ("Plaintiff has felt significant shortness of breath and chest tightness after his battle with COVID-19.").) Some allegations within the SAC even expressly indicate that Plaintiff did not have these alleged impairments during his employment at the Hospital. (*See, e.g.*, SAC ¶ 66 (alleging that when he fit tested at the Hospital after testing negative for COVID-19, "he tasted the solution" during the test).) Hence, because Plaintiff fails to plausible allege that he "suffer[ed] a substantial limitation

in a major life activity *at the time he experience[d] [the] [alleged] adverse employment decision*, then he [was] not 'disabled' at the pertinent time when the [Hospital] authorized [the alleged adverse] action. . . ." *Monroe v. Cortland Cnty.*, 37 F. Supp. 2d 546, 553 (N.D.N.Y. 1999) (emphasis added); *see also Dean v. Westchester Cnty. P.R.C.*, 309 F. Supp. 2d 587, 595 (S.D.N.Y. 2004) ("[T]here is no indication that Plaintiff actually suffered from these alleged sleep disorders at the time when he was working for [the Defendant]." (emphasis added)).

At best, Plaintiff only plausibly alleges that his inability "to get a peaceful night's rest" occurred during his employment at the Hospital because he alleges that such inability began "since he got COVID." (SAC at 3.) But even then, without more, Plaintiff still fails to describe in some "detail the frequency, duration, or severity" of his alleged sleeping problems, and how they affected him *at the time of his employment at the Hospital. Kelly*, 200 F. Supp. 3d at 393; *see also Mazzocchi v. Windsor Owners Corp.*, 204 F. Supp. 3d 583, 612 (S.D.N.Y. 2016) (holding that because plaintiff failed to "provide any details regarding the frequency or severity of the insomnia," her assertions of his alleged inability to sleep constituted little more than "conclusory declarations . . . insufficient to raise a question of material fact.").

But even when assuming that Plaintiff had all the alleged impairments he lists in the SAC during his employment at the Hospital, he nonetheless fails to allege that such impairments substantially limited one or more of his major life activities.

First, while "a short-term [limitation] can qualify as an actionable disability under the ADA," *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 93 (2d Cir. 2021), and "eating is a major life activity," *Price v. Mount Sinai Hosp.*, 458 F. App'x 49, 51 (2d Cir. 2012), Plaintiff fails to plausibly allege how his alleged limitation on his taste or smell caused by COVID-19 "significantly limits" his ability to eat—such as in his ability to eat and digest food. *See, e.g.*,

*Telemaque*, 2016 WL 406384, at \*8 (limitations that are "unaccompanied by any 'impairment to [the] ability to eat and digest food,' simply do not rise to substantial level.").

Additionally, Plaintiff's alleged loss of joy in eating, or his inability to indulge in foods like soda, chocolate, and alcohol, are neither major life activities, nor do they result in actual substantial limitations to his diet. *See, e.g., Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 642 (2d Cir. 1998) ("In deciding whether a particular activity is a 'major life activity,' we ask whether that activity is a significant one within the contemplation of the ADA, rather than whether that activity is important to a particular plaintiff."). Nor do Plaintiff's general allegations about his digestion (such as his heartburn) and dietary modifications (such as an inability to drink carbonated liquids), are severe enough to constitute as substantially limiting to major life activities. *See, e.g., Shields v. Robinson-Van Vuren Associates, Inc.*, 98CIV8785DLC, 2000 WL 565191, at \*5 (S.D.N.Y. May 8, 2000) ("[A] dietary modification does not constitute a restriction 'as to the condition, manner[,] or duration under which an individual can perform' the activity of eating.[] Nor are the asserted modifications severe enough to be considered by any reasonable factfinder as substantially limiting.").

Further, as already discussed above, Plaintiff's allegations about his alleged inability to "get a peaceful night's rest," and similarly his alleged difficulty concentrating, brain fog, memory loss, and nightmares, without more, fail to describe in some "detail the frequency, duration, or severity" of his alleged [impairments]," and how they affected him *at the time of his employment at the Hospital. Kelly*, 200 F. Supp. 3d at 393; *see also Mazzocchi*, 204 F. Supp. 3d at 612. Additionally, Plaintiff's allegation averring that he has a "worry" of not being able to return to school is a conclusory and speculative allegation that cannot plausibly allege that such "worry" constitutes an impairment that substantially limits a major life activity. *See Monroe*, 37 F. Supp.

19

2d at 553. Moreover, the Court agrees with Defendants that Plaintiff's bare allegations that these impairments now make certain tasks "arduous" or "difficult" fail to sufficiently establish, first, that these activities are major life activities, and second, how these activities are substantially limited in comparison to the average person. *See, e.g.*, *Baerga v. Hosp. For Spec. Surgery*, 97 CIV.0230(DAB), 2003 WL 22251294, at \*6 (S.D.N.Y. Sept. 30, 2003) (holding that plaintiff's allegations of how his panic disorder impaired his thinking abilities were insufficient to support "his claim that his inability to think and concentrate is substantially limited in comparison to the average person").

And lastly, the Court agrees with Defendants that Plaintiff's alleged restrictions on breathing are similarly unavailing. For one thing, exercise is not a major life activity. *See Johns-Davila v. City of New York*, 99 CIV 1885 RMB AJP, 2000 WL 1725418, at \*6 (S.D.N.Y. Nov. 20, 2000). Similarly, the other alleged restrictions on his breathing, without more, are insufficient. *See Shine v. New York City Hous. Auth.*, 19-CV-04347 (RA), 2020 WL 5604048, at \*7 (S.D.N.Y. Sept. 18, 2020) ("[P]laintiffs must plead more than vague or conclusory allegations regarding 'difficulty' or 'trouble' conducting a major life activity" to sufficiently allege a substantial limitation) (citations omitted)).

  2. *The Hospital Regarding Plaintiff as Contagious Even After Recovering from COVID-19*

With respect to the second basis—that the Hospital regarded him as infectious even after he recovered from COVID-19, like the one in his previous complaint, such claim is still wholly speculative. To begin, "mere knowledge of an employee's impairment does not establish that the employer regarded the employee as disabled." *Weigl v. Verizon New York, Inc.*, 08CV2549ADSETB, 2010 WL 11632654, at \*4 (E.D.N.Y. June 24, 2010) (citations omitted). Hence, insofar as Plaintiff merely alleges that Defendants knew that he had been infected with

COVID-19 is insufficient. Further, the SAC contains no facts from which the Court could reasonably infer that the Hospital regarded Plaintiff's alleged infectiousness post-COVID-19 to substantially limit his ability to work, or perform any other major life activity. *Id.*

If anything, the opposite is true. Even when drawing all inferences in his favor, Plaintiff's own allegations directly contradict his claim that the Hospital regarded him as infectious even after he recovered from COVID-19. Most notably, Plaintiff alleges that after testing negative for COVID-19 and going back to work, he asked his supervisor if there were any new masks, for which she replied, among other things: "Didn't you get fit-tested yesterday?"; "You passed yesterday. What games are you playing?"; "What do you want us to do about it?" (*See* SAC ¶¶ 69–74.) Plaintiff himself also alleges that his regular manager told him to "[j]ust get fit tested again." (*Id.* ¶ 78.) As Defendants argue in their briefing, "if [they] truly believed that Plaintiff . . . was contagious, why would they ask or allow Plaintiff to return to work generally, let alone in the ICU, which Plaintiff admits is replete with immunocompromised patients?" (Mot. at 21; SAC ¶¶ 96, 98.) Therefore, Plaintiff fails to plausibly allege that the Hospital regarded him as disabled based on his potential to infect others of COVID-19 despite him having recovered from the same.

### 3.    *Plaintiff's Chronic Kidney Disease as Actual Disability*

And with respect to his third basis, Plaintiff still fails to allege that his chronic kidney disease alone or in combination with COVID-19 substantially limits a major life activity. "Beyond simply identifying an impairment, this standard requires . . . Plaintiff to plead facts supporting a reasonable inference that [he] is substantially limited in [his] ability to engage in such major life activities as caring for [himself]; performing manual tasks; walking; seeing; hearing; or working." *Gentleman v. State U. of New York-Stony Brook*, 16-CV-2012(ADS)(AKT), 2017 WL 2468963, at *3 (E.D.N.Y. June 6, 2017), *aff'd*, 21-1102-CV, 2022 WL 1447381 (2d Cir. May 9, 2022). Yet, despite alleging that he has had chronic kidney disease since he was an infant (SAC ¶ 52), nowhere

in the SAC does Plaintiff allege, much less suggest, that prior to contracting COVID-19, his chronic kidney disease substantially limited a major life activity. *See, e.g.*, *Irby v. N.Y. City Transit Auth.*, No. 99 CIV. 2172(VM), 2000 WL 1634413, at *2 (S.D.N.Y. Oct. 30, 2000) (finding plaintiff who alleged that symptoms of polycystic kidney and polycystic liver disease caused her to miss work at least two to three days each month was not substantially limited in any major life activity), *aff'd*, 262 F.3d 412 (2d Cir. 2001); *cf. Abrams v. Reade*, 419 F. Supp. 2d 476, 483 (S.D.N.Y. 2005) ("Scioscia does not suggest that his kidney stones substantially limited any major life activity. While Duane Reade was aware of Scioscia's kidney stones, Scioscia has not introduced any evidence that his kidney stones were perceived by his employer to limit any major life activity).

Furthermore, insofar as Plaintiff alleges that his chronic kidney disease was exacerbated by COVID-19, he fails to plausibly allege how such disease constituted a disability or handicap *during his employment at the Hospital*. *See, e.g.*, *Langella v. Mahopac Cent. Sch. Dist.*, No. 18-CV-10023 (NSR), 2020 WL 2836760, at *10 (S.D.N.Y. May 31, 2020) (dismissing ADA claim where plaintiff did "not allege how, if at all, his hypertension or heart disease impacts a major life activity, let alone that either significantly restricts it"). And insofar as Plaintiff alleges that his chronic kidney disease, together with his particular vulnerability to contract COVID-19 again with potentially severe consequences, Plaintiff's allegations still fail because "it is the nature of the ordinary limitations—not the severity of the consequences if a plaintiff fails to follow necessary treatment—that determines whether a limitation on a major life activity is substantial." *Krikelis v. Vassar Coll.*, 581 F. Supp. 2d 476, 485 (S.D.N.Y. 2008).

In sum, Plaintiff has failed to plausibly allege that he has an impairment that substantially impairs one or more major life activity and therefore has failed to plausibly allege that he is disabled or handicapped under the Rehabilitation Act. Therefore, because Plaintiff fails to establish

a *prima facie* case for his Rehabilitation Act claims against the Hospital, the Court dismisses such claims accordingly.

## IV. State Law Claims

Because the Court has dismissed all of Plaintiff's federal law claims, it declines to extend supplemental jurisdiction over the remaining state law claims and dismisses these claims without prejudice. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . ."); *see also Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims").

## V. Leave to Amend

As a final matter, leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (internal quotation marks omitted). "Leave to amend, though liberally granted, may properly be denied" for "'repeated failure to cure deficiencies by amendments previously allowed'" or "'futility of amendment,'" among other reasons. *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended twice, after having the benefit of Defendants' pre-motion letters stating the grounds on which they would move to dismiss, as well as the Court's previous highlighting his claims' deficiencies. Generally, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to

amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257–58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories *seriatim*.") (alteration, footnote, and internal quotation marks omitted); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted).

Further, Plaintiff has not otherwise suggested that he is in possession of facts that would cure the deficiencies that Defendants highlighted in the instant motion and that the Court highlighted in this opinion. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if plaintiff fails to specify how amendment would cure the pleading deficiencies in the complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004) (*per curiam*) (district court did not abuse its discretion by not granting leave to amend where there was no indication as to what might have

been added to make the complaint viable and plaintiffs did not request leave to amend); *see also Twohig*, 519 F. Supp. 3d at 169 (dismissing claims with prejudice and without leave to amend because plaintiff had already amended once after having the benefit of a pre-motion letter from defendant stating the grounds on which it would move to dismiss).

Accordingly, the Court dismisses Plaintiff's federal claims with prejudice.

CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motions to dismiss and DISMISSES Plaintiff's Second Amended Complaint in its entirety. Specifically, the Court dismisses Plaintiff's federal claims with prejudice, and his state claims without prejudice. The Clerk of Court is directed to terminate the motion at ECF No. 44, and this action, and to enter judgment accordingly.

Dated:  September 6, 2022
        White Plains, NY

SO ORDERED:

NELSON S. ROMÁN
United States District Judge